UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION


| | | |
|---|---|---|
| URETEKNOLOGIA DE MEXICO S.A. | ) | CASE NO:  4:16-CV-02762 |
| DE C.V., ET AL., | ) | |
| | ) | CIVIL |
| Plaintiffs, | ) | |
| | ) | Houston, Texas |
| vs. | ) | |
| | ) | Wednesday, March 27, 2019 |
| URETEK (USA), INC., ET AL., | ) | |
| | ) | (9:11 a.m. to 11:53 a.m.) |
| Defendants. | ) | (1:13 p.m. to  1:33 p.m.) |

JURY TRIAL – DAY 3

BEFORE THE HONORABLE NANCY K. JOHNSON,
UNITED STATES MAGISTRATE JUDGE



**Appearances:**             See next page



Case Manager:            Shannon Jones

Court Recorder [ECRO]:   Suzanne Guevara

Transcribed By:          Exceptional Reporting Services, Inc.
                         P.O. Box 18668
                         Corpus Christi, Texas 78480-8668
                         361 949-2988






Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>**APPEARANCES FOR:**</u>

Plaintiffs:                    ISAAC VILLARREAL, ESQ.
                               ERIC M. UTERMOHLEN, ESQ.
                               McCathern
                               2000 West Loop S., Suite 1850
                               Houston, TX 77027


Defendants:                    EUGENE B. WILSHIRE, JR., ESQ.
                               Wilshire & Scott
                               13810 Champions Forest Dr., Suite 140
                               Houston, TX 77069

                               JOHN P. VENZKE, ESQ.
                               The Venzke Law Firm, LLP
                               P.O. Box 667485
                               Houston, TX 77266

                               RAMON M. DEL VILLAR, ESQ.
                               P.O. Box 61097
                               Houston, TX 77208

3

## INDEX

| PLAINTIFFS' WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MINDY HOWARD | 4 | 16 | 18 | 19 |
| GALEN HOWARD | 21 | 24 | 28 | |
| BRUCE LEON BLACKER | 58/72 | | | |

Mindy Howard - Direct / By Mr. Villarreal          4

1          **Houston, Texas; Wednesday, March 27, 2019; 9:11 a.m.**

2                              **(Call to Order)**

3          **(Jurors present)**

4                **THE COURT:**  All right, be seated, please.  So --

5                **MR. VILLARREAL:**  I call Mindy Howard.

6                **THE COURT:**  Okay, all right.  Then let's get

7     Ms. Howard.

8                **MR. WILSHIRE:**  Judge, that's not our agreement but

9     that's fine.

10               **THE COURT:**  All right.  Let's just -- I don't think

11    it makes that much difference but --

12               **THE CLERK:**  Would you raise your right hand, please?

13         **MINDY DIANE BARRON HOWARD, PLAINTIFFS' WITNESS, SWORN**

14               **THE CLERK:**  You may be seated.

15               **THE COURT:**  All right, Ms. Howard, be sure to keep

16    your voice up.

17               **THE WITNESS:**  Okay, thank you.

18                          **DIRECT EXAMINATION**

19    **BY MR. VILLARREAL:**

20    Q    Good morning, Ms. Howard.  Over here.

21    A    Good morning.

22    Q    Will you please state your full name for the record?

23    A    Mindy Diane Barron Howard.

24    Q    Ms. Howard, do you live in Flower Mound, Texas?

25    A    Yes.

1    Q    Thank you for being here today.  I appreciate it.

2         Mr. Barron is your father, Brent Barron?

3    A    Correct.

4    Q    And Amy Hyde is your sister?

5    A    Yes.

6    Q    And do you have another sister?

7    A    I do.

8    Q    What's her name?

9    A    Jennifer Berryhill.

10   Q    And you have three children?

11   A    I do.

12   Q    Thirteen, 16 and 18?

13   A    Yes.

14   Q    What do you do for a living?

15   A    I am a licensed marriage and family therapist.

16   Q    And how long have you been a licensed family therapist?

17   A    Since October of 2018, I received my associate's license.

18   Q    How long is the program -- the schooling program to get

19   there?  Is it a four-year degree plus or is it -- I mean, what

20   is it?  How long does it take to get it?

21   A    Well, it depends.

22   Q    What did you do?

23   A    I entered the program in 2014 and I graduated last May.

24   Q    And is it you spread it out because you had an awful lot

25   of obligations and you took time?  Could you have done it

Mindy Howard - Direct / By Mr. Villarreal                    6

1  sooner full-time, part-time?  How did --

2  A    I was not quite part-time.  It's sort of in between part-

3  time and full-time.

4  Q    Okay.  Did you work during the time that you were going to

5  school?

6  A    Well, there are requirements of the program.  So I was an

7  intern at UT Southwestern Medical Center in the Family Studies

8  Center.

9  Q    Okay.

10  A    And that was a little bit more like a full-time job in

11  addition to course work.  And I have other obligations.

12  Q    Sure.  So from 2000 -- in 2014, you started the program?

13  A    Yes, January, uh-huh.

14  Q    And you went part-time at UT -- well, you went to school

15  either part-time -- a little more than part-time sometimes

16  between there and October of 2018 when you got your license?

17  A    I graduated in May of 2018.

18  Q    And then there's a licensing procedure and extra stuff you

19  have to do?

20  A    Board exams and -- yes, extra stuff.

21  Q    Sorry.

22  A    That's all right.

23  Q    I want to go back to 2014, that timeframe.  Obviously,

24  your children were younger than 13, 16 and 18.

25           But before we get into that, have you spoken with

Mindy Howard - Direct / By Mr. Villarreal                    7

1   Mr. Barron or Mr. Brown about the testimony that was given in

2   this courtroom yesterday or the day before, before you sat down

3   here today?

4   A    No.

5   Q    Okay.  What about with anybody else about what the

6   testimony was in the courtroom yesterday or the day before?

7   A    No, sir.

8   Q    So going back to 2014, were your children active in

9   extracurricular activities, soccer or tennis or golf or

10  anything -- I mean, things that most kids are into?

11  A    Yes.

12  Q    Okay.  How active?

13  A    Well, they are attending a rigorous school and my daughter

14  was the drum captain.  Another one was the woodwind captain.

15  My son is an accomplished musician.  He practices 25 hours a

16  week with a group.  It's a busy life.

17  Q    Congratulations on your children.

18       A lot of time driving them around?

19  A    Well, my daughters are driving now.

20  Q    And I want to go back to 2014.

21  A    2014.

22  Q    Yes, so five years ago.

23  A    No, they weren't driving then.

24  Q    So who got them to all their things?

25  A    Mostly me.  A lot of it happens at their school.  So they

1   can stay late after school.  It just depends.

2   Q    Weekly and weekend functions?

3   A    Weekly and weekend.

4   Q    Weekly, meaning they have events that you'd go watch if

5   they had.  You mentioned musician.  So I'm guess --

6   A    Uh-huh.

7   Q    -- they had concerts of some sort.

8   A    Sure, sure.  We had --

9   Q    And you'd go to those things and those were --

10  A    It just depends, yeah.

11  Q    What's your affiliation -- well, are you familiar with a

12  company called, "Structural Plastics, Inc."?

13  A    Yes.

14  Q    What's your affiliation with that company?

15  A    Well, my husband and I run Structural Plastics.

16  Q    Okay.

17  A    It's a business that we started in 2010.

18  Q    What does it do?  What's its primary business purpose?

19  A    Mostly we sell polyurethane.

20  Q    Okay.

21  A    Why did you and your husband decide to set up this

22  business in 2010?

23  A    Well, my husband is a physician and at the time, I was

24  teaching yoga.  I was making about $9 a class.  It was not

25  profitable and there was a lot of context happening in our

1    country.   The Affordable Care Act was changing the landscape of

2    medicine in Texas and other places, in Denton County

3    specifically.   Our reimbursements were declining from insurance

4    and we were looking to generate other streams of income.   So

5    this seemed like something unrelated to medicine that would be

6    secure.

7    Q     Okay.   Extra income, is that a good summary?   You were

8    looking for extra income?

9    A     Oh, sure, we could just say that.   Thank you.

10   Q     No, that's fine.   I appreciate the understanding.

11   A     Yeah.

12   Q     But you were trying to supplement the income of the

13   family; is that what --

14   A     Right, yes.

15   Q     Has SPI -- and I'm going to call it that if that's okay

16   with you.   Has SPI ever had -- done any marketing?

17   A     Not really.   No, not --

18   Q     No website?

19   A     No.

20   Q     Yeah.   Does it have brochures it sends out?

21   A     No, I don't think we've ever had a brochure.

22   Q     How does SPI find people to find buy -- that it would try

23   to sell or resell the polyurethane materials to?

24   A     Well, there are contacts that we have through my family

25   who would reach out and express interest and --

Mindy Howard - Direct / By Mr. Villarreal                10

1  Q    So you get put in contact with a potential buyer through

2  your dad's company, Uretek, basically?

3  A    More or less, yeah.  I'm not really sure.

4  Q    Who else in the family would be giving you contacts for

5  people that need the product that SPI sells?

6  A    Besides --

7  Q    Besides your father and the Uretek USA folks?

8  A    There are, yeah, lots of family members that are

9  affiliated there.  So --

10 Q    So the Uretek family?

11 A    Yeah.

12 Q    The Uretek USA --

13 A    Uh-huh.

14 Q    -- and so a lot of your family members work there?

15 A    Uh-huh.

16 Q    Your sister Amy?

17 A    Uh-huh.

18 Q    I'm sorry.  For the record, you need to --

19 A    I'm sorry.  Yes, yes.  Amy works there.  Thank you.

20 Q    Who else in your family works there?

21 A    Oh, gosh.  Well, my aunt Candy Carney (phonetic), my

22 brother-in-law, my mother right -- has done various things

23 there.  I'm trying -- I'm sorry.  A little nervous, I'm trying

24 to think of --

25 Q    And, no, understood.

Mindy Howard - Direct / By Mr. Villarreal                 11

1   A    -- all the various people.

2   Q    And I don't need all the names.

3   A    Okay.

4   Q    Give me a number, five people, six people?

5   A    I have no idea.

6   Q    Okay.

7   A    I'm sorry.  That wouldn't be a good --

8   Q    That's fine.  But with respect to someone reaching out and

9   saying to you, here's a potential sale.  Reach out to them and

10  see if they want to buy what SPI is selling.  Did you do the

11  direct contact or did SPI directly contact the end user, for

12  lack of a better term, or did you say, hey, these guys need --

13  or were you told, these guys need a hundred thousand pounds of

14  the material you sell, sell it to them?  How did it work?

15  A    Everything goes through my phone.  It's just my phone

16  number is attached to the business.  It always has been and so

17  I would get a phone call, typically.

18  Q    From the end user?

19  A    Uh-huh.

20  Q    I want to talk about 2014.  How many times did you receive

21  a phone call from a gentleman named Luis Sosa?

22  A    How many times did Luis --

23  Q    Sosa call you to order materials?

24  A    I have no idea.

25  Q    Did he ever?

Mindy Howard - Direct / By Mr. Villarreal                12

1    A    I can't remember.

2    Q    What about Abel Guzman?

3    A    I'm sorry.  I don't remember phone calls from five years

4    ago.

5    Q    Okay.  You're familiar with a company called "ALSO

6    Construccion y Supervision" -- we call it "ALSO" for short -- a

7    Mexican legal entity that goes by -- I'll call it a trade name

8    -- "Polilift."  You're familiar with that company?

9    A    Sure, yes.

10   Q    Yes.  Over the course of the relationship between SPI and

11   Polilift, how often did you communicate with Polilift

12   representatives by phone?

13   A    Can you repeat that?

14   Q    Over the course of time that you were selling stuff --

15   A    Uh-huh.

16   Q    -- to help you -- SPI was selling stuff to Polilift, how

17   often did you speak with Polilift representatives?

18   A    It wasn't frequent but I can't say.

19   Q    Did you ever --

20   A    Did --

21   Q    -- speak with a representative from ALSO Polilift

22   directly?

23   A    I -- yes, but I can't say how many times.

24   Q    Okay.  I understand.

25   A    Okay.

Mindy Howard - Direct / By Mr. Villarreal                13

1  Q    No, I understand.  I'm not trying to make you remember

2  things that the average person can't remember.  I'm not mad at

3  you.  I just want the truth.  No, you're fine.

4            Do you speak Spanish?

5  A    Poco.

6  Q    Very good.

7  A    Just a little bit.  No, really, I couldn't carry on a

8  conversation in Spanish.

9  Q    So for the dealings with Polilift, most of those came

10 through Uretek and back to you?

11 A    Uh --

12 Q    Meaning, Uretek would contact somebody at -- either

13 Polilift and its representatives would contact somebody at

14 Uretek USA and then they would, in turn, let you know that they

15 needed polyurethane foam for a sale to take place?

16            MR. VENZKE:  Excuse me, your Honor.  I object.

17 There's no evidence.  We haven't testimony to that effect and

18 he's speculating on behalf of them.

19            MR. VILLARREAL:  There's absolutely and as

20 Mr. Barron --

21            THE COURT:  Repeat the question.

22            MR. VILLARREAL:  Whether she received orders from

23 Polilift through Uretek.  And we've seen --

24            MR. VENZKE:  Well, that wasn't his question.

25            THE COURT:  All right.  So let's ask the question

Mindy Howard - Direct / By Mr. Villarreal                    14

1    again.

2              **MR. VILLARREAL:**  Okay.

3    **BY MR. VILLARREAL:**

4    Q    Did you receive the orders from Polilift through Uretek,

5    meaning Polilift contacted Uretek and Uretek sent the orders to

6    you?

7    A    I think I've already said that people would call me

8    typically and if I had -- that I would send things to Uretek,

9    questions -- does that answer your question?

10   Q    You would send things to Uretek?

11   A    Yeah.

12   Q    Okay.

13   A    I would call my dad or call my sister if I had questions

14   and --

15   Q    Okay.

16   A    Yeah.

17   Q    Now, there's been testimony indicating that your agreement

18   with Uretek USA and your -- excuse me -- SPI's agreement with

19   Uretek USA began in January of 2013.  Is that true?

20   A    I'm sorry?

21   Q    The agreement for you to be able to resell materials --

22   A    Uh-huh.

23   Q    -- that you obtained from Uretek USA, there has been

24   testimony and documentary evidence saying that began in January

25   of 2013.  Is that true?

Mindy Howard - Direct / By Mr. Villarreal                 15

1   A    I am not --

2           MR. VENZKE:  Your Honor, that's -- well, that's not

3   the testimony, Judge.  2013 --

4           THE COURT:  Who said that?

5           MR. VILLARREAL:  It's an email from Mr. -- it's a

6   letter from Mr. Barron to Mr. Howard saying, "extending our

7   January 2013 sales agreement" and I can go find the document

8   but it's a document -- I think it's in 106 and it identifies --

9           THE COURT:  All right.

10           MR. VILLARREAL:  -- the agreement between SPI and

11   Uretek --

12           THE COURT:  All right.

13           MR. VILLARREAL:  -- as January 2015.

14           MR. VENZKE:  Extending the 2010 agreement.

15           THE COURT:  So --

16           THE WITNESS:  That doesn't sound correct.

17           MR. VILLARREAL:  Okay.

18           THE COURT:  So at -- you know, if it doesn't -- he

19   says -- if he's saying something that's not correct, then you

20   need to correct him then.

21           THE WITNESS:  Okay.

22           THE COURT:  Okay?  So --

23   BY MR. VILLARREAL:

24   Q    So you had an agreement prior to 2013?

25   A    Well, Structural Plastics was formed in 2010 and --

Mindy Howard - Cross / By Mr. Venzke          16

1   Q    We have seen documents of invoices to Polilift -- ALSO

2   Polilift from Structural Plastics dating up until sometime in

3   2016.  Has SPI sold additional materials or equipment or goods

4   of any type to ALSO since 2016?

5   A    I'd have to go back and look.

6   Q    Is SPI still in business?

7   A    Yes.

8   Q    Has SPI filed its 2017 tax return?

9   A    Certainly.  Yes, I'm -- yeah.

10  Q    Do you recall what the amount of sales might have been for

11  that year?

12  A    I don't.

13  Q    Do you obtain the polyurethane that you resell from

14  anywhere other than Uretek USA?

15  A    No.

16          MR. VILLARREAL:  I'll pass the witness, your Honor.

17          MR. VENZKE:  May I approach, Judge?

18          THE COURT:  Of course.

19       (Counsel approaches)

20                    CROSS EXAMINATION

21  BY MR. VENZKE:

22  Q    This is -- Mindy, this is some exhibits I'm going to go by

23  the number.

24  A    Okay.

25  Q    And then I may use the --

1          **MR. VENZKE:**  Can you turn the Elmo on?

2          **THE CLERK:**  I'm going to turn it on now.

3    BY MR. VENZKE:

4    Q    Just to get corporate organization down, Mindy -- or Ms.

5    -- let me call you Ms. Howard.  Look at Exhibit 21 in that

6    book, please -- or it'll be up here too.  You may -- you're

7    younger.  You may be able to see it better.

8    A    Okay.

9    Q    Some of us have to -- this is Exhibit 21 and it is -- I'll

10   learn how to do this -- Certificate of Formation for Profit

11   Corporations for Structural Plastics, Inc. dated September

12   13th, 2010?

13   A    Yes.

14   Q    Is that when the company was formed?

15   A    Yes.

16   Q    And since then, has it been in continuous operation?

17   A    Yes.

18   Q    And Exhibit 22 is a notice from the Secretary of State

19   that you have to pay -- you have to pay some taxes but you have

20   to pay a franchise tax every year to stay in business?

21   A    Uh-huh, yes.

22   Q    And here is -- from the State of Texas saying that you

23   have paid franchise taxes?

24   A    Yes.

25   Q    And so the company is a real company --

Mindy Howard - Redirect / By Mr. Villarreal        18

1   A     Yes.

2   Q     -- that really conducts business?

3   A     Yes, sir.

4   Q     It's not some fantasy company, is it?

5   A     No.

6   Q     Okay.  That's all I've got.

7             **THE COURT:**  Anything else, Mr. Villarreal?

8                       **REDIRECT EXAMINATION**

9   **BY MR. VILLARREAL:**

10  Q    Ms. Howard, just real quick with regards to that, is it

11  true that in 2014, the company lost its -- it lost the right to

12  do business?

13  A    I'm not sure what you're referring to.

14  Q    Isn't it true that in October of 2014, the company

15  forfeited its right to transact business in Texas?

16  A    I have no memory of that.

17  Q    If you'll look at Plaintiffs' Exhibit 137, please.  And

18  when you get there, I actually want to go look at a sentence at

19  the bottom.  It says, "TEX137-007."  Are you with me?

20  A    Uh --

21            **MR. VENZKE:**  No, we're not.  Hold on.

22  A    Okay, I think I'm there.

23  Q    Okay.  And this is a document entitled, "Texas Notice of

24  Forfeiture of Right to Transact Business."  Taxpayer name says,

25  "Structural Plastics, Inc." and the date of the notice is

1   October 24th, 2014 and the date of forfeiture is October 17th,

2   2014.  Did I read that correctly?

3   A    Yes.

4         MR. VILLARREAL:  Pass the witness.  Pass the witness,

5   your Honor.

6         THE COURT:  All right.

7                       RECROSS EXAMINATION

8   BY MR. VENZKE:

9   Q    Do you know if there's a -- there is a franchise

10  forfeiture.  Do you know that those taxes were paid and the

11  company is now up and doing business again?

12  A    Yes.  I think that this was just kind of a blip.

13  Q    A glitch?

14  A    Yeah, it was just an oversight.  It -- I can --

15  Q    That's okay.

16  A    -- I really can barely remember it.

17  Q    That's all right.

18  A    Yeah, sorry.

19        MR. VENZKE:  That's all I have.

20        THE COURT:  All right.  Thank you, ma'am.  You may

21  stand down.

22        THE WITNESS:  Thank you.

23     (Witness steps down)

24        THE COURT:  Your next witness, Mr. Villarreal?

25        MR. VILLARREAL:  I call Dr. Galen Howard.

20

1          **THE COURT:**  Ms. Howard, would you send your husband

2   in?

3          **MR. SPEAKER:**  Thank you, ma'am.

4          **MR. VENZKE:**  And, Judge, can she leave now that she's

5   stepped down?

6          **MR. VILLARREAL:**  I have no objection to that.

7          **THE COURT:**  Is she released?

8          **MR. VENZKE:**  She's released?  No, she's here.

9          **THE COURT:**  I mean, everyone is releasing her as a

10  witness?  That's my question.

11         **MR. SPEAKER:**  I have released her as long as she's

12  not going to be called back.

13         **MR. VENZKE:**  Yes.

14         **THE COURT:**  That's what releasing means.  She can't

15  be called back.

16         **MR. SPEAKER:**  No, we're not going to call her back,

17  right?

18         **THE COURT:**  All right.  Then you may stay,

19  Ms. Howard.

20         **THE WITNESS:**  Thank you.

21         **THE CLERK:**  If you would raise your right hand.

22  //

23  //

24  //

25  //

1                **GALEN EVAN HOWARD, PLAINTIFFS' WITNESS, SWORN**

2                          **DIRECT EXAMINATION**

3      **BY MR. VILLARREAL:**

4      Q    Good morning, sir.  Over here, sorry.

5      A    Good morning.

6      Q    Will you please state your full name for the record?

7      A    Galen Evan Howard.

8                **THE COURT:**  All right.  That is not going to be loud

9      enough.

10               **THE WITNESS:**  Okay.

11               **THE COURT:**  I have been on everyone, not just you.

12               **THE WITNESS:**  Okay.  Galen Evan Howard.

13               **THE COURT:**  Better.

14     **BY MR. VILLARREAL:**

15     Q    Much better, thank you.

16               Where -- and you're from Flower Mound, Texas?

17     A    Yes.

18     Q    And what do you do for a living?

19     A    I'm a urologist.

20     Q    I can't --

21     A    Urologist.

22     Q    Thank you.  And how long have you been a urologist, sir?

23     A    Twelve years.

24     Q    And you're married to Mindy Barron Howard?

25     A    Yes.

Galen Howard - Direct / By Mr. Villarreal                    22

1   Q    When did you guys get married?

2   A    July 10th, 1999.

3   Q    Do you have three children?

4   A    Yes.

5   Q    Ages 13, 16 and 18?

6   A    Yes.

7   Q    And I understand from your wife's testimony that they're

8   very successful and very good students and such busy kids?

9   A    Yes.

10  Q    What's your affiliation -- are you familiar with the

11  company called Structural Plastics, Inc.?

12  A    Yes.

13  Q    What's your affiliation with that company?

14  A    I'm the president of the company.

15  Q    How much time do you spend working on Structural Plastics,

16  Inc. business?

17  A    As far as, like --

18  Q    Hours a -- let's just say hours a week.

19  A    Hours a week?  I would say less than one.

20  Q    What's Structural Plastics, Inc.'s primary business?  What

21  do you --

22  A    Selling polymer.

23  Q    How many customers does SPI have?

24  A    Five.

25  Q    Who are they?

1  A     There is ALSO.  There is the Polilift.  There's Aldara

2  (phonetic).  There's -- I forget the name of the company from

3  South Korea.

4  Q     You mentioned ALSO and then you mentioned Polilift.  Are

5  they the same or are they different -- different entities?

6  A     I'm not sure.

7  Q     Who introduced you to ALSO and its representatives?

8  A     I don't remember.

9  Q     How did you obtain them as a customer?

10  A     I believe we received a phone call and that was the

11  introduction but I don't have recollection of when that was.

12  And then we had orders come through at that point.

13  Q     Who handles -- between -- how many people work for SPI?

14  A     Two.

15  Q     Who are they?

16  A     Myself and Mindy.

17  Q     You and your wife?

18  A     Yes.

19  Q     So between the two of you, who handles the day-to-day

20  operations of the company?

21  A     So the day-to-day operations are -- there's not really day

22  to day.  These orders come in, you know, weeks or months apart.

23  And so as far as the banking, Mindy handles that.  You know,

24  she has, you know, conversations with her sister at Uretek to

25  arrange for shipment of material.

Galen Howard - Cross / By Mr. Venzke          24

1    Q    How do -- how does SPI obtain its customers?  I mean, do

2    you market?  Do you have brochures?  What do you do to go get

3    people to know that you're selling what you're selling?

4    A    No, it's word of mouth.

5    Q    Since 2016, has Structural Plastics made any sales to ALSO

6    Polilift in Mexico -- over the course of the last two and a

7    half years, roughly?

8    A    I believe so.

9    Q    Do you have a round number as to how much we're talking

10   about?

11   A    I do not.

12   Q    Are they multiple sales?

13   A    Yes.

14   Q    When's the last sale SPI made of the polyurethane foam

15   that it sells to ALSO Polilift in Mexico?

16   A    I'm not sure.

17   Q    Would it be in 2019?

18   A    I believe so.

19          **MR. VILLARREAL:**  Pass the witness, your Honor.

20                      **CROSS EXAMINATION**

21   **BY MR. VENZKE:**

22   Q    Dr. Howard, how are you?

23   A    I'm doing well.

24   Q    Okay.  I'm going to ask you some questions.  The first

25   question is, during the board when the case first started, it

Galen Howard - Cross / By Mr. Venzke                    25

1   was related by the lawyers for the Plaintiffs that SPI is a

2   pretend company.  Is it a pretend company?

3   A     No.

4   Q     We've seen the incorporation in 2010.  There were some

5   questions about the charter being forfeited for a while.  In

6   2010 -- let's say between 2010 and 2016, how many companies did

7   SPI sell product to?

8   A     Can you say those dates again?

9   Q     Yeah.  To the date it was formed --

10  A     Uh-huh.

11  Q     -- until, say, about 2014, 2015.

12  A     Okay.  There's, I believe, three companies that we were

13  selling to.

14  Q     Now, I've got some -- I'm going to refer some exhibits and

15  I'm not going to forward everybody to them -- Defendants'

16  exhibits here.

17  A     Okay.

18  Q     And you'll be able to see them up here too.

19  A     Okay.

20  Q     Did you sell any product to companies in Colombia?

21  A     Yes.

22  Q     The jury will be able to see these in Exhibits 12, 18, 19

23  and 20 which contain a bunch of invoices.  I don't want to go

24  through all of those.  I just want to show a few from those

25  countries.  Exhibit 12 has 0 -- it's Bates Stamp 000047.  I'm

Galen Howard - Cross / By Mr. Venzke                    26

1    going to get this before I'm done.

2              Is this a Structural Plastics exhibit -- I mean,

3    purchase order or which is this, purchase order or invoice?

4    A     Invoice.

5    Q     And who is it to?

6    A     Aldara -- Alara (phonetic).

7    Q     And is that a company you do business with?

8    A     Yes.

9    Q     And have done business with since you started?

10   A     Yes.

11   Q     And it's in Colombia?

12   A     Yes.

13   Q     Okay.  And there are other invoices that you know about

14   that exist on that company?

15   A     Yes.

16   Q     Okay.  Are you doing business in Panama?

17   A     Yes.

18   Q     And do you remember that company?

19   A     Yes.

20   Q     Who is that?

21   A     I know the --

22   Q     Here, I'll help you.  I don't want to -- this isn't a

23   test.

24   A     That's Canada.

25   Q     Canada.  Who did you deal with?

Galen Howard - Cross / By Mr. Venzke                    27

1    A    Poly-Mor (phonetic).

2    Q    Okay.  And have you done business with them for several

3    years?

4    A    Yes.

5    Q    And starting back in 2010?

6    A    Yes.

7    Q    Okay.  And done business with -- business in Canada?  Oh,

8    this is Canada.  Korea?  Have you done business in Korea?

9    A    Yes.

10   Q    And do you remember the name of that company?

11   A    I don't remember the name.

12   Q    Okay.  We have purchase orders in here that show that,

13   correct?

14   A    Yes.

15   Q    All right.  Do you know -- and I won't try to pronounce it

16   and I don't speak much Spanish -- well, less than your wife

17   knew.  The Plaintiffs in this case, do you know those

18   companies?  Do you speak Spanish?

19   A    I do not.

20   Q    Do you recall Nolia de Mexico S.A. De C.V. and F1 Company?

21   Have they ever bought anything from you?

22   A    No.

23   Q    Have they ever come to you and said, we'd like to buy a

24   polymer from you?

25   A    No.

1  Q    Urelift S.A. de C.V., do you know them?

2  A    No.

3  Q    Have they ever come to you and said, we'd like to buy a

4  polymer from you?

5  A    No.

6  Q    Do you know Mr. Alvarez who's sitting over here?

7  A    No.

8  Q    Do you know if he's ever come to your company in all those

9  years and said, I want to buy a polymer?

10 A    No, he has not.

11         **MR. VENZKE:**  No more questions, Judge.

12                     **REDIRECT EXAMINATION**

13 **BY MR. VILLARREAL:**

14 Q    Dr. Howard, SPI has a polymer purchase agreement with

15 Uretek; is that correct?

16 A    Yes.

17 Q    And when did it enter into an agreement -- into a polymer

18 purchase agreement with Uretek?

19 A    2010.

20 Q    Have you testified or given sworn testimony different than

21 that?

22 A    No.

23         **MR. VILLARREAL:**  Your Honor, I'd like to show

24 Mr. Howard an interrogatory response.  I'm just going to use

25 that one.

Galen Howard - Redirect / By Mr. Villarreal                29

1        **THE COURT:**  Go ahead.  Just show it to him.

2   Q    Dr. Howard, in front of you, you're going to --

3        **THE COURT:**  Why don't we do this?  Let's take that

4   down, show it -- hand it to him --

5        **MR. VILLARREAL:**  Okay.

6        **THE COURT:**  -- and see if that refreshes his

7   recollection.

8        **MR. VILLARREAL:**  And before I step on something, your

9   Honor, let me make sure I have the right one.  I apologize.  I

10  had a different piece of paper.  I'll withdraw the question.

11       I'll pass the witness, your Honor.

12       **THE COURT:**  All right.

13       **MR. VENZKE:**  No more questions.  Thank you, Doctor.

14       **THE COURT:**  Thank you, Dr. Howard.  You may stand

15  down.

16       **(Witness steps down)**

17       **MR. VILLARREAL:**  Your Honor, I call Bruce Blacker.

18  Your Honor, we're going to have a number of -- we're going to

19  have a -- some slides to put up, just demonstratives are going

20  to be up there.

21       **THE COURT:**  Okay.

22       **THE CLERK:**  Raise your right hand, please.

23       **THE WITNESS:**  I was sworn in on Monday.

24       **THE CLERK:**  Oh, you were sworn?  Okay, never mind.

25       **THE COURT:**  Then you're still under oath.

1        **MR. WILSHIRE:**  Your Honor, we haven't been provided

2   with any slides or anything.

3        **MR. VILLARREAL:**  Do you want a copy of the slides?

4   He needed yesterday to prepare them after testimony and what

5   not.

6        **THE COURT:**  All right.

7        **MR. VILLARREAL:**  I didn't see them until this --

8        **THE COURT:**  From where -- where did you prepare the

9   slides from?  What testimony or evidence?

10       **MR. VILLARREAL:**  I have -- Mr. Blacker?

11       **THE WITNESS:**  I prepared the slides.  It comes from

12  my expert report that I issued in this case as a demonstrative.

13  Rather than go through all of the invoices and things, I have

14  some summaries.

15       **THE COURT:**  All right.  So have those numbers been

16  prepared from evidence in this case -- things admitted?

17       **THE WITNESS:**  Absolutely.  Every number -- being an

18  accountant, I'll get into the details but every number can be

19  found in my expert report.  One number -- after I issued my

20  expert report, Defendants pointed out that there was a number

21  from two documents.  The net result is my damages number went

22  down.

23       **THE COURT:**  Okay.

24       **THE WITNESS:**  There's only one number that won't tag

25  to my report.

1          **THE COURT:**  I am not so much interested that your

2    number was in your report.  The point is your number has to be

3    in evidence.  It has to be not just something that you put down

4    at another time but it's based on evidence that I've admitted

5    for trial.

6          **THE WITNESS:**  At the bottom of each slide, to the

7    best of my ability, I -- if it isn't just summarizing like my

8    background, it cites a document.

9          **MR. VENZKE:**  Slides we haven't seen.

10          **MR. WILSHIRE:**  And the numbers we've never heard of.

11          **MR. VILLARREAL:**  If they want a chance to look at

12    them, I'll give them to them.

13          **THE COURT:**  All right.  Let's take a break right now

14    and you can look through and make sure that we're relying on

15    evidence that's been admitted.  All right.

16          The jury will take a break.  Let's at least try to do

17    our morning break now.  Let's be back in 15 minutes.  So I'll

18    expect you to kind of look through these things and see where

19    we go.  All right?  Take it away, Mr. Malick (phonetic).

20      **(Jurors exit the courtroom at 9:49 a.m.)**

21          **THE COURT:**  All right.  See where we're going.  Who's

22    going to look and check?

23          **MR. VILLARREAL:**  I only have one hard copy of this.

24    You guys can take a look if you want to.

25    //

32

1          **(A recess is taken from 9:50 a.m. to 10:18 a.m.)**

2          **(Outside the presence of the jury)**

3                    **THE COURT:**  All right.  Be seated.  Shannon's getting

4      the jury.

5                    **MR. VILLARREAL:**  Your Honor, before they come out, I

6      think counsel wants to talk about some things, and I don't want

7      to --

8                    **MR. WILSHIRE:**  We've got to talk about this.

9                    **THE COURT:**  All right.  All right.  Well, I'll tell

10     Shannon to not -- all right.

11                   **MR. WILSHIRE:**  I'm sorry.

12                   **THE COURT:**  Hold on.

13                   **MR. WILSHIRE:**  Yeah.

14         **(Pause)**

15                   **THE COURT:**  Okay.

16                   **MR. WILSHIRE:**  I'm sorry.

17                   **THE COURT:**  That's all right.  We're on the record.

18     What's the problem?

19                   **MR. WILSHIRE:**  I've just been handed a 51-page new

20     report that changes everything they gave me prior to trial,

21     with one exception that doesn't matter, but every number has

22     been changed.  They've deleted over and over again.  You know,

23     I'm sitting here; we've -- we've (indisc.) most of these; a lot

24     of these were taken out, and they didn't even tell me

25     yesterday.  They didn't tell me this morning.  They didn't tell

1    me anything until I just asked them, "Wait a minute; what's

2    that?"  And this is -- these may go -- these may be slides, but

3    there are reports, there's incremental -- there are (indisc.)

4    I've never even heard of.  I have a long deposition of this

5    man.  And I've gotten ready for trial based on his report and

6    his deposition, and then I'm blindsided.

7             **THE COURT:**  Okay.

8             **MR. VILLARREAL:**  May I respond?

9             **THE COURT:**  Mr. Villarreal?

10            **MR. VILLARREAL:**  The reality is everything in here

11   was in the report.  All of it.  We have taken out what the

12   Court ordered to be taken out per the Court's summary judgment

13   slash motion to strike part of his testimony; that's gone.  It

14   was related to the -- to the beach project and the time value

15   of money opinion that we offered.  So, that's gone.

16            Also, in the course of a trial sometimes you make it;

17   sometimes you don't.  I don't think we had evidence to support

18   part of what was in his report initially.  And I just don't

19   think we have it here, which includes the charts for the

20   increased cost of polymers; meaning we had to go hire someone

21   else and buy polymers from a third party for a lot more than

22   what we could gotten.  We, obviously, as a business decision,

23   decided --

24            **THE COURT:**  Okay.

25            **MR. VILLARREAL:**  -- I'm not going to go make that

34

```
1    argument to the jury.  That's not in there.  We took it out.

2    What we limited it to -- and we can point to Table 2, Table 4,

3    Table 5 in his report -- lost profits for reduced bids, and

4    that's -- one forty puts all of these contracts that are

5    identified in his report in via a summary document.

6              THE COURT:  So, lost profits for reduced bids.  These

7    are bids that --

8              MR. VILLARREAL:  Projects we completed --

9              THE COURT:  -- you completed --

10             MR. VILLARREAL:  -- but had to reduce our prices.

11             THE COURT:  And this is -- so, that's evidence of --

12   that goes to your breach of contract --

13             MR. VILLARREAL:  Correct.

14             THE COURT:  -- on the non-compete.

15             MR. VILLARREAL:  Correct.

16             THE COURT:  So, and that's always been there.

17             MR. VILLARREAL:  That's always been there.

18             THE COURT:  So --

19             MR. VILLARREAL:  And then we have --

20             MR. WILSHIRE:  Except it's --

21             MR. VILLARREAL:  I'm sorry.

22             MR. WILSHIRE:  Except it's different.

23             THE COURT:  What's different?

24             MR. WILSHIRE:  Well, your numbers.

25             MR. VILLARREAL:  And this is where I think -- may I,
```

1   Judge?

2          **THE COURT:**  Okay.  Go ahead.

3          **MR. VILLARREAL:**  Again, I didn't know how far back we

4   were going to be able to prove -- the limitations argument.

5   There was one number in our report in that Table 4 that had a

6   project that went back to 2011.

7          **THE COURT:**  Okay.

8          **MR. VILLARREAL:**  I didn't get there.

9          **THE COURT:**  Okay.

10          **MR. VILLARREAL:**  I didn't get there.  I can't ask for

11   it.  I'm not going to ask for an amount --

12          **THE COURT:**  All right.  So, you've taken that out.

13          **MR. VILLARREAL:**  So, we took it out.  Everything else

14   is the same.  It reduces the number from 6.8 million to 6.11.

15   It's -- yet it's taking four instead of five projects.  I

16   simply didn't get there over the course of the trial.  And I

17   wish I was better at my job and I could have done that, but I

18   didn't.  So, Mr. Blacker's report's going to be based upon

19   admissible evidence.  I didn't get evidence that says I'm

20   entitled to 2011.  So, that part's out.  We then have the Metro

21   project that we've talked about for a long time.  And we spent

22   more time in this trial talking about Metro Linea A and that

23   lost project.  That's the next one, lost profits for that

24   project.  And that's towards the --

25          **THE COURT:**  And that's based on --

 1          **MR. VILLARREAL:**  (indisc.).

 2          **THE COURT:**  That's your tortious interference.

 3          **MR. VILLARREAL:**  Correct, your Honor.  And, then, we

 4   have the actual contract from the Chapultepec -- excuse me --

 5   another lost -- the other lost project that I mentioned that we

 6   have the contract in that they got as a direct contract --

 7          **THE COURT:**  And that's --

 8          **MR. VILLARREAL:**  -- as opposed to --

 9          **THE COURT:**  And that's another tortious interference

10   with perspective.

11          **MR. VILLARREAL:**  Correct, your Honor.

12          **THE COURT:**  All right.

13          **MR. VILLARREAL:**  And then we have contractual damages

14   that we have in the report that were for the liquidated damages

15   provision in the contract for sale of goods into Mexico.  All

16   of those are in the report.  And those numbers are

17   substantially the same, with the exception of that we took out

18   one project for the lost profits on completed projects.  And,

19   then, the rest was I didn't meet the burden to allow me.  So,

20   if Mr. Blacker testified to everything in his report, your

21   Honor, you'd be yelling at me for doing things that were

22   improper because they are not in evidence, because I didn't get

23   there or it's been shown --

24          **THE COURT:**  Okay.

25          **MR. VILLARREAL:**  -- but it's barred by limitations

1   (indisc.).  Yes, it changed from what he saw; but that's

2   because our case didn't get to where I was hoping it would get.

3   So, we're asking for what's on this list, which is here, these

4   parts, and I can identify exactly in the report where they are,

5   what they talk about; none of that's changed.  Mr. Blacker

6   informed me that one number changed because in response to his

7   report, opposing -- the opposing expert identified in the

8   contract two different numbers, and Mr. Blacker might explain

9   it better than me, but what he did is he took the lower of the

10  two.  And that changed that number for one of the four projects

11  for the lost profits.

12          **MR. WILSHIRE:**  Well, Judge --

13          **MR. VILLARREAL:**  That's it.

14          **MR. WILSHIRE:**  -- now, here's how we started this.

15  "Oh, we've got a few slides we want to show."  And then it

16  comes the report's different.  One thing he says is, "I changed

17  the report" based on your ruling nine months ago.  Nine months

18  ago you made your ruling on the (indisc.).

19          **THE COURT:**  Uh-huh.

20          **MR. WILSHIRE:**  I don't know when the (indisc.) report

21  (indisc.).  They've changed the report now based on what our

22  expert said, and that was given to them months ago.

23          **MR. VENZKE:**  Months and months ago.

24          **MR. WILSHIRE:**  And they say, "You're not being harmed

25  because we're reducing our damages."  That's ridiculous,

```
 1   because their whole theory is not good, and we were showing
 2   their whole theory is no good, and then to, frankly, come in
 3   and say, "Oh, well, we've got slides," is just offensive.  It's
 4   kind of like what you saw with these people.  We fought tooth
 5   and nail, as you know, about a subpoena for these people.  To
 6   disrupt their lives, the Howards, when he comes down and asks
 7   four ridiculous questions, that's -- Dr. Brown's here.  They
 8   have no -- no evidence even.  That's what this case is about.
 9   They're doing their discovery during this trial.  And this is a
10   totally different report.  We've Dauberted -- we filed a
11   Daubert motion.  This report ought to be  barred in total.
12              MR. VENZKE:  I agree.
13              MR. WILSHIRE:  It's not our problem what they did.
14              THE COURT:  All right.  Well, let me see these
15   slides.  Because I don't have a problem with the expert
16   reducing his damages based on "we didn't meet our burden."
17              MR. WILSHIRE:  Well, this is the first time I've
18   heard the word "we didn't meet our burden."  He had to have
19   known he wasn't going to meet his burden.  And I haven't had a
20   chance to go back and check any of this to see if it's right.
21   And I have --
22              MR. VENZKE:  Now, what we don't want to do is let's
23   just stop and you have a do over.  We don't want a Mulligan or
24   a do over, because we're -- we've been ready to go to trial;
25   we've done everything we can do, and now we get this, and it
```

39

1    changes everything.

2            **MR. WILSHIRE:**  I can't -- I can't check them.

3            **MR. VILLARREAL:**  Your Honor, this is --

4            **THE COURT:**  Hold on.

5            **MR. VILLARREAL:**  This was --

6            **THE COURT:**  Hold on.  You're all talking.

7            So, let's go through these slides and see where we

8    go.  There's probably no problem with the first one, no problem

9    with the second one; do you have a --

10           **MR. VILLARREAL:**  I don't have a copy with me, your

11   Honor, but --

12           **THE COURT:**  Okay.  All right.

13           **MR. VILLARREAL:**  Oh.  I'll look at it on the

14   computer.

15           **MR. SPEAKER:**  And we're on two?

16           **MR. SPEAKER:**  Yeah.

17           **THE COURT:**  Page two, education, work experience; no

18   problem there.  Problem -- no problem with number three.

19   Number four, information considered.  Do you have a problem

20   with that one, that slide?

21           **MR. WILSHIRE:**  Yes, because these are all different.

22           **THE COURT:**  All different from what?

23           **MR. VILLARREAL:**  Well, my --

24           **MR. WILSHIRE:**  From any numbers I ever had before.

25           **THE COURT:**  No.  Number -- no.  This page.  This

1   page.

2          **MR. WILSHIRE:**  Oh.  No, I don't have a problem with

3   that one.

4          **THE COURT:**  Okay.  All right.

5          **MR. WILSHIRE:**  Sorry.

6          **THE COURT:**  So, you have a problem with the summary

7   of claim damages, this slide, and that's because he's lowered

8   his numbers.

9          **MR. WILSHIRE:**  He's lowered his numbers, and I don't

10  know how he got there.  It would take me -- everything I did

11  was prepared based on his deposition --

12         **THE COURT:**  All right.  So --

13         **MR. WILSHIRE:**  -- and the numbers that I already

14  have.

15         **THE COURT:**  All right.  So, when -- Mr. Villarreal,

16  when you're going on -- let's just take lost profits of 6.11

17  million claimed on the reduced bid prices.  Is Mr. Blacker

18  going to testify how he got to 6.11?

19         **MR. VILLARREAL:**  Absolutely.  And it's going to

20  mirror his --

21         **THE COURT:**  So, where is that slide?

22         **MR. VILLARREAL:**  Bruce, I might need your help with

23  this one.

24     **(Pause; voices and whispers off the record)**

25         **MR. VILLARREAL:**  Uh --

41

1          **THE COURT:**  Is it this one?

2          **MR. VILLARREAL:**  It's -- the end result is -- that's

3    part of it.

4          **MR. SPEAKER:**  (indisc.)

5          **MR. VILLARREAL:**  It's the number of (indisc.) that

6    come together, and then it gets to, I think, the 21st page that

7    you're going to have in front of you, Judge, and it will have

8    the -- the four projects that were reduced as a result of all

9    the competition.  It looks like this.  But the three or four

10   slides before that I think break down each of the -- you know,

11   the approved price -- the approved price, actual price, price

12   reduction.

13         **MR. VENZKE:**  Judge, I want to know, when this

14   epiphany hit him that they've got a problem.

15         **MR. SPEAKER:**  Where's the one that you showed me?

16     **(Pause; voices and whispers off the record)**

17         **THE COURT:**  So, on slide 21, which shows how the 6.1

18   was calculated, was this in his expert report?

19         **MR. SPEAKER:**  No.

20         **MR. WILSHIRE:**  (indisc.)

21         **THE COURT:**  Let's see it.

22     **(Pause)**

23         **MR. BLACKER:**  Do you want me to help?

24         **THE COURT:**  I want you to find where --

25         **MR. SPEAKER:**  Find it --

42

1              **THE COURT:**  -- 21 is in your expert report.

2         **(Pause; voices and whispers off the record)**

3              **MR. VILLARREAL:**  May I approach, your Honor?

4              **THE COURT:**  Yes.

5              **MR. VILLARREAL:**  So, this is tab six.  I'm sorry

6    (indisc.).

7              **THE COURT:**  That's all right.  I'm okay.

8              **MR. VILLARREAL:**  But that first line is the one we

9    took out.  This is the 2011 project; see that?

10             **THE COURT:**  Uh-huh.

11             **MR. VILLARREAL:**  So, those numbers --

12             **MR. SPEAKER:**  Your Honor --

13             **MR. VILLARREAL:**  -- 1.718 disappeared.  And that's --

14   and what those are, the difference matches (indisc.).

15             **THE COURT:**  So, where is this number?

16             **MR. VILLARREAL:**  The 25.53?

17             **THE COURT:**  Uh-huh.

18             **MR. VILLARREAL:**  That's the approved amount of --

19   that's a conversion number from the 735.

20             **THE COURT:**  Yes, but it's not in here.

21             **MR. VILLARREAL:**  Okay.  It might be on the part --

22   where is the --

23             **MR. SPEAKER:**  You see, your Honor?  I have no idea --

24             **THE COURT:**  I get it.  I get it.  I'm trying to

25   figure out.

1          **(Pause; voices and whispers off the record)**

2          **MR. VILLARREAL:**  And, again, your Honor, the reason

3   being that that slide's a summary of a number of different tabs

4   in the thing, so that's why it gets to an end result of a bunch

5   of different analysis he did to get to that 25 number.

6          **(Pause; voices and whispers off the record)**

7          **MR. VILLARREAL:**  Was the number 2576, your Honor?

8          **THE COURT:**  Twenty-five fifty-three.

9          **MR. VILLARREAL:**  Fifty-three.  So, that's (indisc.)

10  project.

11         **(Pause; voices and whispers off the record)**

12         **MR. SPEAKER:**  I don't know what you're looking at.

13         **MR. VILLARREAL:**  What date is that project?

14  (indisc.) project.

15         **THE COURT:**  Don't know.

16         **MR. VILLARREAL:**  Oh, there it is.  Twenty-five fifty-

17  three.

18         **MR. WILSHIRE:**  What page are you looking at?

19         **MR. VILLARREAL:**  Twenty-five fifty-three.  I had to

20  go down through all the projects listed.  That's one of the

21  projects with the 13, so -- and the 140; 2553 is right there.

22  If you go all the way down, it's that (indisc.) project listed

23  right there.

24         **THE COURT:**  All right.  This is so different from

25  what his expert report -- how his expert report was --

44

1          **MR. VILLARREAL:**  Well, these are summaries.

2          **THE COURT:**  -- laid out --

3          **MR. VILLARREAL:**  This isn't a report.

4          **THE COURT:**  I get it.

5          **MR. VILLARREAL:**  It's a summary.

6          **THE COURT:**  I get it.  It's not a report.  But it is

7  so different that I'm not going to let you use the slides.  He

8  can testify about whatever he's testifying to, and you can

9  write it on my whiteboard, wherever my whiteboard is; I will

10 get it.

11         **MR. WILSHIRE:**  And I --

12         **THE COURT:**  And I --

13         **MR. WILSHIRE:**  I have had no discovery on this.

14         **THE COURT:**  And I will give you some leeway on cross

15 examination.  In other words -- let's do this.  You'll put on

16 your expert, and you can cross examine him tomorrow morning.

17         **MR. WILSHIRE:**  My expert can't testify until he hears

18 what this guy is really going to say.

19         **THE COURT:**  Okay.  Well, he's going to testify, and

20 then we will --

21         **MR. VENZKE:**  Then, he'd be --

22         **THE COURT:**  Do you have any other expert?

23         **MR. VENZKE:**  Well, then, he could be impeached that

24 he's changed his report.

25         **THE COURT:**  Of course.

1              **MR. WILSHIRE:**  And, but again --

2              **MR. VENZKE:**  Well, it just puts us in an untenable --

3    I mean, Judge --

4              **THE COURT:**  I --

5              **MR. VENZKE:**  -- we're here because --

6              **MR. SPEAKER:**  You (indisc.) --

7              **MR. VENZKE:**  We're here because they didn't prepare

8    their case right.  We talked about this, and I've never been in

9    a case this large where (indisc.) --

10             **THE COURT:**  But, Mr. Venzke, an expert can always

11   dial back on his report based on lack of evidence.  So, that's

12   not something that I'm passing out over.  But I'm concerned

13   about the magnitude of the changes and the fact that the report

14   and these slides are so dissimilar it's hard to know where he's

15   getting the information.

16             **MR. WILSHIRE:**  And I -- and I spent days preparing

17   for the cross examination based on his deposition and his

18   report, and now I'm asked to examine on testimony I've never --

19   had no idea was coming.

20             **THE COURT:**  And --

21             **MR. VENZKE:**  And, basically, take his --

22             **MR. VILLARREAL:**  They --

23             **MR. VENZKE:**  -- have him take his deposition in front

24   of the jury is what we're going to be doing.

25             **MR. WILSHIRE:**  And, well, I'm just -- I'm shocked.

46

```
 1   Absolutely.  It's --

 2            THE COURT:  All right.  So, this is what we're going

 3   to do.  I'm going to allow you to put Mr. Blacker on.  Is he

 4   your last witness?

 5            MR. VILLARREAL:  Unless something weird happens,

 6   yeah.  Yes.  I'm sorry.

 7            MR. VENZKE:  Something weird just happened.

 8            THE COURT:  What would weird happen?

 9            MR. WILSHIRE:  (indisc.) weird.

10            THE COURT:  What would -- you know.  All right.

11            MR. VILLARREAL:  He's supposed to be my last witness,

12   Judge.

13            THE COURT:  Okay.  Then, we will reconvene tomorrow

14   morning.  You can -- I'll give you all day to figure out your

15   cross examination, and you can cross examine him tomorrow

16   morning, and --

17            MR. VILLARREAL:  Would you like to give --

18            THE COURT:  -- finish on your case.

19            MR. VILLARREAL:  Would you like to give me time to

20   prepare in case -- for -- and look at this stuff?  I haven't

21   stopped to look at this report -- and give him more time.  I'm

22   happy to accommodate whatever (indisc.).

23            MR. SPEAKER:  Well, of course, but --

24            MR. VILLARREAL:  But -- no, but --

25            THE COURT:  I'm not going to let you use that.
```

1          **MR. VILLARREAL:**  But I think --

2          **THE COURT:**  That is so --

3          **MR. VILLARREAL:**  -- without using it.  Without using

4   it, your Honor, but it has information that he thinks is

5   different, and I'm happy to give it to him and let him do that

6   to accommodate whatever --

7          **THE COURT:**  Yes, he can look at that.

8          **MR. WILSHIRE:**  Well, I'm looking here, for example.

9   I assume he's going to testify about -- to this.  And he's got

10  a document here that wasn't in his -- was not in his papers.

11         **THE COURT:**  I'm not letting him use any of those

12  slides.

13         **MR. WILSHIRE:**  But he's going to testify to

14  something.  And I --

15         **MR. VILLARREAL:**  Your Honor, he can take his report

16  and whatever documents he wants up there with him as part of

17  his testimony.

18         **MR. WILSHIRE:**  He can't take these slides up there

19  with him.

20         **THE COURT:**  Correct.

21         **MR. VILLARREAL:**  He can take his report; he can take

22  documents relied upon and refresh his memory and look at stuff

23  (indisc.).

24         **MR. WILSHIRE:**  Well, we --

25         **MR. VILLARREAL:**  That's what the slides were going to

1    do.  They were going to get us there and he was going to give

2    the analysis behind how he got there.  And it was just going to

3    speed up the process.  It's --

4         **MR. WILSHIRE:**  Uh --

5         **MR. VILLARREAL:**  I tender to the Court that there's

6    argument that things have changed.  Nothing's changed, other

7    than the points I made, meaning the things that the Court

8    struck we, obviously, aren't talking about, and the things that

9    I don't think we met our burden on we're not talking about.

10   Everything else is in the report.  And the numbers did not

11   change.

12        **MR. VENZKE:**  Now, when did you figure that out?  When

13   did --

14        **THE COURT:**  The report, how -- I mean, the report is

15   one inch thick of tiny, tiny spreadsheet items with minute

16   fonts.

17        **MR. VILLARREAL:**  Because it analyzed --

18        **THE COURT:**  Yes.

19        **MR. VILLARREAL:**  -- 15 contracts --

20        **THE COURT:**  Exactly.  Exactly.

21        **MR. VILLARREAL:**  -- and that's --

22        **THE COURT:**  It's tiny and it's dense.  And for him to

23   change everything and just say, "Well, it's in my report

24   somewhere," and you're pointing, "Well, this number came from

25   this page and this number came from this page," this is just

1   way too much surprise at the last minute.  So --

2          **MR. VENZKE:**  When did he realize that he had this

3   problem?

4          **MR. VILLARREAL:**  When did he realize?

5          **MR. VENZKE:**  Yeah.

6          **MR. VILLARREAL:**  He didn't realize anything.  I

7   realized.

8          **THE COURT:**  All right.  So --

9          **MR. VILLARREAL:**  I'm the one who has to put on and

10  meet my burden.

11         **THE COURT:**  We're going to -- I'm going to let

12  Mr. Blacker testify, and then you can cross examine him

13  tomorrow morning.

14         **MR. VENZKE:**  How long are you going to put him on?

15         **MR. VILLARREAL:**  Without being able to summarize

16  things, it's going to take a long time.

17         **THE COURT:**  Okay.  Then, that's what's going to

18  happen, because I think that these slides are so materially

19  different from his report and his testimony that they're just

20  prejudicial at this point.

21         **MR. VILLARREAL:**  Your Honor, I'd like to ask for some

22  permission to go -- I don't want to be here for eight hours

23  today with Mr. Blacker going through the pages, pages.  I would

24  like a chance to go prepare to present something much more

25  efficiently.  We're not allowed to rely upon this, your Honor.

1   It would make everybody's life easier, including the jury, and

2   I think --

3             **THE COURT:**  Well, then -- then, we don't know what

4   you're going to present tomorrow.

5             **MR. SPEAKER:**  No.

6             **THE COURT:**  That's the problem.

7             **MR. VENZKE:**  What is the testimony --

8             **MR. SPEAKER:**  Can I --

9             **MR. VENZKE:**  What is the testimony that made him

10  change his mind?  What is it?

11            **THE COURT:**  Well, I don't really care about that.  I

12  mean, that's --

13            **MR. VENZKE:**  Well, I'm just saying, Judge, he's put

14  himself in this box.  Because even in closing he didn't own the

15  problem.

16            **THE COURT:**  So -- so, the bottom line on Mr. Blacker

17  is he thinks -- and I gave you back your slides -- he thinks

18  for the Metro project it's 6.11 million, right?

19            **MR. VILLARREAL:**  No.  May I?

20            **THE COURT:**  Okay.

21            **MR. SPEAKER:**  The reduced bids, which -- which is

22  four projects instead of five.

23            **THE COURT:**  It's 14 million.

24            **MR. VILLARREAL:**  That's adding them all up.  So, it's

25  6.11 and -- and I'm sorry to look over your shoulder, Judge,

1   (indisc.).

2   **THE COURT:**  That's fine.

3   **MR. VILLARREAL:**  The lost profits is for the four

4   completed projects at the top; that's 6.11.  The lost profits

5   from lost projects is going to be that STC, the Metro project

6   that we talked about at length --

7   **THE COURT:**  Okay.

8   **MR. VILLARREAL:**  -- and the Chapultepec project that

9   we talked about at length.  And those are --

10   **THE COURT:**  And what's the contractual damages with

11   UDM?

12   **MR. VILLARREAL:**  The invoices and the sale into

13   Mexico; there's a provision in the sublicense agreement that

14   says we get 50 percent of the gross receipts of anything sold

15   into --

16   **THE COURT:**  Oh, this is SPI sale --

17   **MR. VILLARREAL:**  Yes.

18   **THE COURT:**  -- into --

19   **MR. VILLARREAL:**  Which we've argued is --

20   **THE COURT:**  Okay.

21   **MR. VILLARREAL:**  -- really Uretek selling directly.

22   And that's the -- we call that a liquidated damages provision,

23   which isn't there.  And that's all in the report.  And none of

24   that's changed.  The numbers haven't changed.  This is simply a

25   summary of what the Court has identified as something that's

1    voluminous.  And I think Mr. Blacker will explain, and

2    everything he talks about he's going to point to where he got

3    the information.  And as the Court notes, 140 summarizes all of

4    the contracts that are listed in there, and when we had a

5    discussion about getting all of those contracts into evidence

6    or not, we agreed to do it via summary because you didn't want

7    an entire binder, and I agreed, so we took those out to save

8    paper.  This is simply a summary of what's already in his

9    report, with the exception of the fact that I -- the facts I

10   just mentioned.  I didn't meet my burden to get all the way

11   back to 2011, so I'm starting at -- I took that one out.  The

12   Metro and Chapultepec contracts, those have not changed at all.

13          **MR. WILSHIRE:**  I don't know that.  That's the

14   problem.

15          **THE COURT:**  All right.

16          **MR. WILSHIRE:**  He says they haven't changed.  I don't

17   know that because I haven't had the opportunity to see if they

18   haven't changed.

19          **MR. VILLARREAL:**  Your Honor, here's a hypothetical

20   question.  What if they were able to exclude certain evidence

21   during the course of trial that didn't allow me to get the

22   Metro project, for example?  Did my expert (indisc.) because he

23   gave a report under the assumption that it would be met?

24          **THE COURT:**  No.  Of course not.

25          **MR. VILLARREAL:**  And that's the argument I'm hearing

1   right now; is that because we didn't get somewhere I can't

2   introduce these.

3          **THE COURT:**  I don't disagree with you,

4   Mr. Villarreal.  The problem is that this report, which goes

5   way, way, way beyond -- I mean, you're showing pictures of

6   people working, relevant parties.  I mean, this is -- you know,

7   it's way, way, beyond.

8          **MR. VILLARREAL:**  And those -- those are from the

9   report, your Honor, and --

10          **MR. VENZKE:**  Well, let me see --

11          **MR. WILSHIRE:**  We don't care about the pictures.

12          **MR. VENZKE:**  No, we don't care about that.

13          **MR. WILSHIRE:**  We -- you know --

14      **(Pause; voices and whispers off the record)**

15          **MR. VILLARREAL:**  Your Honor, may I approach?  Can I

16   show you the report?  And I think it will answer some things.

17   There's argument there is some surprise about the report.  If

18   you look at that -- here are the five projects that we say were

19   reduced bid projects.

20          **THE COURT:**  Uh-huh.

21          **MR. VILLARREAL:**  Okay.  In Exhibit 140 we went

22   through in great detail and actually they were bolded in

23   Exhibit 140.

24          **THE COURT:**  Uh-huh.

25          **MR. VILLARREAL:**  This is the one we took out.  Here

1    are all of the numbers that we did.

2              **MR. WILSHIRE:**  I can't hear you.

3              **MR. VILLARREAL:**  Here are all the numbers that we

4    did.  I'm sorry, Gene.  I'm talking about Table 2 in the report

5    and how it reflects the numbers for those projects.  So, Table

6    2, those are the (indisc.); that's the start date; number -- in

7    140 you've got the start date and the actual price.  Okay?  And

8    that's in the evidence.  Here is the one we took out.  This was

9    increased material polymer cost.  I didn't get there.  So, we

10   decided to skip Table 3 related to those contracts.  He's going

11   to explain what the tables mean.  He then gets to the lost

12   profits of 4.32 and 2.65 for those two.  Well, and actually it

13   went down to 4.31; I guess he just found it differently.  But

14   the numbers are the same.  And that's covered by Table 4.  And

15   the information -- I mean, obviously, the tables cite to a

16   number of different places; number of different places cited

17   throughout here; damages related to lost projects.  Those lost

18   projects are those two; one, two.  Lost profits related to

19   reduced prices are those four; here we are.  It was 6.8.  We

20   took out the first one, and it reduced it to the 6.11.  And the

21   analysis starts -- excuse me -- completed profits for reduced

22   bids, and it talks about them, and it talks specifically about

23   the four projects that compile that.  And it's identical --

24   this was five, but before, and he talks about them and

25   identifies them right here.

```
 1            Nothing -- I get that there may be way too many
 2   slides in there.  And, admittedly, as we went through this and
 3   I gave Mr. Blacker a curveball and said I didn't meet here, I
 4   didn't meet there, take this out, take this out, do these
 5   things, I'm fine taking out pictures; I just -- I'm trying to
 6   envision, in my mind, a way that's not uber painful to go
 7   through all of these things without some assistance, and maybe
 8   one or two slides.  I don't need all of them.  Pictures -- if
 9   you don't want to show pictures or any of that, I'm fine with.
10   But it's all in here related to lost projects.  It identifies
11   the lost projects specifically as Chapultepec and the Metro
12   Line A; one, two.  And it goes through the analysis of how he
13   got there.
14            THE COURT:  But for Chapultepec it says -- okay,
15   2.65.  There.  That's it.  Okay.
16            MR. VILLARREAL:  And 4.31, I think.  And I think, you
17   know, he rounded it.  I have to ask him for that one.  But --
18   and then the summary.  That was the big one.  The increased
19   costs.  And, then, we took out the withheld payments because I
20   didn't meet the burden on the beach project.  I just didn't get
21   there.  And there's 4.3, 2.65, liquidated damages number is
22   exactly the same, 1.46.  And, then, this is summaries of his
23   report -- some of it's --
24            THE COURT:  Okay.
25            MR. VILLARREAL:  It's long, but it's -- and
```

1   identifies some tables and such, what we've got analysis wise,

2   for all of the contracts, because he had to analyze all of the

3   contracts to figure out what the business practice was and so

4   forth.

5       **MR. WILSHIRE:**  And I have never seen this before.  I

6   haven't been able to look at anything.  I --

7       **(Pause)**

8       **MR. VENZKE:**  (indisc.) our expert, Judge.  I just

9   asked him, and he says he -- he doesn't know what he looked at.

10      **(Pause)**

11      **THE COURT:**  Well, it seems counterintuitive that I'm

12  going to make Mr. Blacker stick with his higher numbers that

13  they are backing off on just because that's what you all have

14  relied on.

15      So, I've got to let plaintiff reassess in a downward

16  direction if there is no evidence to support a claim of damage.

17  I've got to let them do that.  But these slides are way -- so,

18  I'm not allowing you to use the slides, except for this one,

19  but after -- only after he's explained his summary numbers you

20  can put those up.  Or you can put it up and just kind of go

21  down, cover it up, how do you get to the 6.1 --

22      **MR. VILLARREAL:**  And I can do that on the ELMO and

23  just kind of --

24      **THE COURT:**  On the ELMO.

25      **MR. VILLARREAL:**  -- use this to kind of cover it up.

1          **THE COURT:**  All right.  So, we're going to hear from

2     Mr. Blacker on his renewed calculation using only that one

3     slide, and I'll give you time at the end of the day and

4     overnight to regroup it for cross examination.  Same for your

5     expert.  They'll hear Mr. Blacker testify this morning, and

6     we'll go from there.  All right?

7          **MR. WILSHIRE:**  I understand (indisc.).

8          **THE COURT:**  I know; no one's happy, including myself,

9     but --

10         **MR. WILSHIRE:**  I understand you're (indisc.).

11         **THE COURT:**  I'm not going to -- yeah.  I'm not going

12    to stop trial.  I'm going to -- I'll give you some extra time,

13    but --

14         **MR. VILLARREAL:**  Your Honor, may I have 30 minutes to

15    meet with Mr. Blacker simply to change everything I was going

16    to ask him just really, really quickly and to say, okay, we're

17    taking this out --

18         **THE COURT:**  Take --

19         **MR. VILLARREAL:**  -- so I can understand and to help

20    us communicate more effectively.

21         **THE COURT:**  All right.  Take 30 minutes and get

22    organized.

23         **MR. VILLARREAL:**  Thank you.

24    //

25    //

1      **(Recess was taken from 10:47 a.m. until 11:26 a.m.)**

2      **(Jury enters)**

3            **THE COURT:**  And we'll go until 5 minutes to 12.  I've

4      got a -- I'm hosting a lunch for CJA lawyers, so I need to be

5      down there.

6            **UNKNOWN SPEAKER:**  I'm going to get a free lunch?

7            **THE COURT:**  You're not a CJA lawyer.

8            **UNKNOWN SPEAKER:**  What is that?

9            **THE COURT:**  Criminal Justice Act.  It's a panel.

10     They take appointments for -- on criminal cases.

11           All right.  Let's be seated.

12           All right.  Mr. Blacker, you're under oath.

13     Mr. Villarreal, take it away.

14        **BRUCE LEON BLACKER, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN**

15                         **DIRECT EXAMINATION**

16     BY MR. VILLARREAL:

17     Q    Thank you, Your Honor.  Mr. Blacker, will you please

18     introduce yourself to the ladies and gentlemen of the jury.

19     A    Good morning.  My name is Bruce Leon Blacker.

20     Q    You'll talk right into the mic so we can hear you better.

21     A    I should know that.

22     Q    And what do you do for a living?

23     A    I'm a CPA and a damage quantifier.

24     Q    What is a CPA?

25     A    Certified Public Accountant.  I think most of the people

Blacker - Direct / By Mr. Villarreal                    59

1    that I know think of CPA's as tax preparers or auditors and

2    that may be true, but there's other areas of specialties that

3    CPA's have.

4              Much like doctors that may have a specialty, CPA's

5    have specialties that they function in and as a CPA I look at

6    financial documents.  I evaluate them and assess them.  I can

7    assess their reliability and how to interpret them and what

8    they might indicate.

9    Q    What is a damage quantifier?

10   A    So, a damage quantifier does quantify damages.  Companies

11   often gets in civil litigations, much like this litigation

12   between these parties.  It always seems to be that one of the

13   parties is saying they sustained economic harm because of the

14   alleged wrongful conduct of the other party, and so, as a

15   damage quantifier and a CPA, I come in and quantify the

16   economic harm that is being alleged.

17   Q    Can you give the jury a brief description of your

18   educational background?

19   A    In 1989 I graduated from Brigham Young University with a

20   Bachelor of Science in accounting.  I also got a Masters in

21   accounting at the same time and then I, as I said before, I'm a

22   certified public accountant.

23             I'm also certified in financial forensics, which is a

24   certification that is recognized by the American Institute of

25   Certified Public Accountants.

1  Q    And what about your professional experience?  Where have

2  you worked after getting your Master's Degree?

3  A    After graduating, I began at KPMG, Peat Marwick.  At the

4  time, I think there were either six or eight of the large

5  accounting firms.  I prepared taxes for a while, specializing

6  in international tax.

7            After a year of doing that, I joined, at least what

8  is now the legacy firms of Price Waterhouse Cooper's and did a

9  little different work.  I worked in their corporate

10  restructuring and litigation.

11            In the early 1990's, there was a lot of bankruptcies

12  going on in Texas and one of my consulting assignments would

13  either be to work for the creditors or the debtors to help

14  companies go through bankruptcy and help restructure those.

15            I also did some business evaluation work and then

16  starting about 1994, is when I started to develop the

17  specialization of damage quantification and quantifying damages

18  and providing litigation services.

19            I worked my way up as a staff and made partner at

20  Price Waterhouse Cooper's.

21            In 2004 I had the opportunity to open the Dallas

22  Office of Analysis Group.  And so, I did -- took that

23  opportunity and that Analysis Group, I've continue to provide

24  litigation consulting services.  Analysis Group works for law

25  firms, corporations, government entities and provides economic

1   accounting and financial consulting services.

2   Q     How many offices does it have?

3   A     There are 14 offices around the world.  I think there's 11

4   of them here in the US.  There's an office in Canada, an office

5   in China, one in France, Belgium.  So, we're internationally.

6   Q     Which office do you work out of?

7   A     I work in the Dallas office.

8   Q     Do you also live there?

9   A     In a small town just north of Dallas, about 30 miles, in a

10  town called Parker, but I do work near downtown Dallas.

11  Q     What's the business of Analysis Group?

12  A     So, Analysis Group would be called upon in litigation

13  cases, as I mentioned.  Attorneys may contact Analysis Group,

14  either myself or the firm, looking for litigation consultants,

15  consulting services.  That's the primary services that we

16  provide.  There are some other strategic and consulting

17  services that we provide.

18  Q     So, I think you kind of gave us a timeline, but how many

19  years of experience do you have as a damage quantifier?

20  A     I think it's in excess of 25 years at this point.

21  Q     And as a damage quantifier, who hires you?

22  A     As a damage quantifier, it's typically the law firm that

23  is representing the company that is filing a lawsuit.

24  Attorneys will call me either to work for the plaintiff or the

25  defendant, so I can work on either side.

Blacker - Direct / By Mr. Villarreal                    62

1          If I am retained by the plaintiff, it's to quantify

2     the damages that the plaintiff is claiming.  If I were to be

3     retained by the defendant, I would evaluate the damages that

4     the plaintiff is claiming.  And, I've worked for both

5     plaintiffs and defendants in my career.

6     Q    Have you ever testified in Court as an expert witness, as

7     you are today?

8     A    I have.  In fact, one of these requirements of an expert

9     witness is to keep track of how many times you've testified, so

10    I do know that number.  I've testified in federal, state or in

11    arbitrations, what I'll call trial, 11 times prior to today.

12    So, this will be the 12th time.  And then, I've provided

13    deposition testimony and I think I've provided 22 deposition

14    testimonies.

15    Q    Make sure the jury knows, was a deposition?

16    A    It's in the process of litigation, a plaintiff files a

17    lawsuit against the defendant and then there is discovery that

18    takes place.  The parties have to exchange documents that are

19    relevant to the allegations.  I come in as an expert.  I look

20    at the documents that the parties have produced in the case.  I

21    form opinions.  I issue an expert report and then I am placed

22    under oath and the other side is allowed to take my deposition

23    to assess and learn more about the analyses that I have

24    performed.

25    Q    And you've been sitting in this courtroom since this trial

Blacker - Direct / By Mr. Villarreal                    63

1   began, correct?

2   A    I have been here, yes.

3   Q    You've heard all of the evidence?  You've seen all the

4   documents that have been admitted by the Court?

5   A    Yes, I have been present here and heard the trial

6   testimony and most of the documents that have been placed up

7   there, but, I've had access to those prior to trial.

8   Q    Now, let's turn to the work that you've done in this case.

9   If you'll tell the jury what your assignment was in this case.

10  A    So, in this case I was contacted by the plaintiffs'

11  counsel, their outside counsel, to evaluate and quantify the

12  damages that have been sustained by the plaintiffs', Urelift

13  and UdeM, as a result of the alleged wrongful conduct of the

14  defendants, Uretek.

15  Q    And, did you complete your assignment?

16  A    I did complete that assignment.

17  Q    Generally, and I mean generally, what information did you

18  review and analyze in performing your work and in reaching the

19  opinion that you will be giving here to the jury today?

20  A    As I mentioned, the process of litigation is that the

21  parties have to produce documents, so I reviewed the financial

22  documents that are being produced by the plaintiffs and by the

23  defendants.  There are some documents in litigation that the

24  parties don't produce, but the attorneys produce, and then

25  there's some independent analysis that I do.

Blacker - Direct / By Mr. Villarreal                    64

1   Q    What types of documents -- what did you review in this

2   case?

3   A    So, as regard to the plaintiffs, you've heard about a

4   number of projects that they've worked on, their contracts

5   associated with those projects, there is bid documents, there's

6   a number of financial documents that are associated with that.

7   It's quite voluminous.  And I reviewed those.  And again, the

8   documents that are produced by the defendant.  Generally

9   focusing on, as an accountant, the financial documents.

10  Q    And did you prepare an expert report in this case?

11  A    I did.  It was on September 15 of 2017 that I issued an

12  expert report.

13  Q    And I think you testified you gave a deposition in this

14  case?

15  A    I did.  I think it was October 13 of 2017.  I was deposed

16  with regard to my expert report that I had prepared.

17  Q    Now, to give your opinions, do you make any assumptions?

18  A    As a damage quantifier, I have to.  I have to assume that

19  liability is going to be found.  It seems to reason that if

20  there's no liability, there would be no damages.

21         So, it doesn't matter if you're on the plaintiffs'

22  side are the defendants' side, as a damage quantifier, I'm

23  operating under the assumption that the (indisc.) of fact is

24  going to find liabilities.  So, that's a required assumption.

25  Q    What's your understanding as to what the wrongful conduct

Blacker - Direct / By Mr. Villarreal                    65

1  is that UdeM and Urelift are asserting in this case?

2  A    Generally, again as a damages expert, I am under the

3  understanding, and I am assuming that the said license

4  agreement grants to Urelift exclusive rights to the Uretek

5  processes and products.  That they have the right to use those

6  products, sell those products, and provide those services in

7  Mexico, and that Uretek had agreed not to interfere with that

8  business or compete in any way with that business that would

9  harm that exclusive license agreement, and that was my general

10 understanding, that the allegation was that they did interfere

11 and that that interference or that wrongful conduct resulted in

12 economic harm.

13 Q    Are there categories of claimed damages that you consider?

14 A    I'll start with two categories.  You've heard about two of

15 the entities, there's UdeM.  There's also Urelift.  The general

16 categories are that Urelift sustained lost profits.  They

17 would've earned more money in the absence of the alleged

18 interference and then the other general category is that UdeM

19 is entitled to contractual damages for any amount of money, or

20 any amount that compensates them, should Uretek sell in Mexico.

21      **(Speaking off the record)**

22 **BY MR. VILLARREAL**

23 Q    And Mr. Blacker, up here, I'm going to put on a summary of

24 plaintiffs' claims, claim damages, and I'm going to cover this

25 part here and just show this.  It says damages type.  Does that

Blacker - Direct / By Mr. Villarreal                    66

1   summarize the categories you just covered?

2   A    It does.  I hate to do this to you, if you would slide it

3   maybe just a little to the right.  Because there is the damages

4   to Urelift relate to the last profits that I was talking about.

5   The damages to UdeM are contractual damages.  So those are the

6   two general categories that I quantified.

7   Q    Now, I want to start with the first one up here.  So, lost

8   profits on completed project on reduced bid prices.  And,

9   before I go there, there's a binder in front of you.  There

10  should be in there, or maybe a separate piece of paper, that

11  has Exhibit 140 in there.  It looks like this.  This document

12  here.  It says 140.

13  A    I found it.  I did.

14  Q    Now, do you know what Exhibit 140 is?

15  A    This is the summary document that's been presented earlier

16  in this case of 15 projects that Urelift completed in Mexico

17  during the time period of 2009 through 2016.

18  Q    Did you review any of those projects and documents related

19  to that at some point in time?

20  A    I reviewed all -- information related to all 15 of the

21  projects, yes.

22  Q    With respect to, again, completed projects here, did you

23  come up with an opinion at some point as to what the lost

24  profits were for completed projects - reduced bid prices?

25  A    Yes I did.

Blacker - Direct / By Mr. Villarreal                67

1   Q    First off, what do you mean by reduced bid prices.

2   A    Maybe, if I can just provide a little bit of information

3   on the types of damages there, you kind of draw a line after

4   that first line, which is the lost profits --

5   Q    You mean right here?

6   A    Yes.  So you see, there's lost profits and right after

7   that colon, these are completed projects.  So, these are

8   projects referring to these 15 projects that Urelift actually

9   finished, but they sustained lost profits.

10            In a little bit, we'll get to the other categories,

11  which you'll see are lost projects, but, I wanted to make sure

12  you understood that the reduced bid price, or that the

13  completed projects are on the top and that relates to projects

14  where Urelift, because of wrongful -- interference or wrongful

15  competition in Mexico, had to do the project at a reduced bid

16  price.

17  Q    Now, how many of those completed projects did you

18  consider, or did you analyze and determine that there were lost

19  profits related to a project?

20  A    So, I looked at all 15 and then determined that there

21  were, of those projects, there were four.  Originally, when I

22  issued my expert report, I had looked at five.  But, for

23  purposes of today, I understand there's a legal requirement

24  that's going's have me talk to you about four, I determined

25  there were four that sustained lost profits.

Blacker - Direct / By Mr. Villarreal                   68

1   Q    On this list, can you identify which four those are?

2   A    I can.  And, I do not speak Spanish, so I'll refer to the

3   acronyms on the right-hand side.  CAPUFE, SIOP number one and

4   SIOP number two and then GFB.

5   Q    Is that right there up on the screen?

6   A    Yes.  Those are the four projects that I determined where

7   Urelift sustained lost profits as a result of the alleged

8   wrongful conduct of the defendants.  And, I think you heard the

9   testimony from Mr. Alvarez to that effect as well.

10  Q    Now, what was part of your analysis to get the lost

11  profits for these four projects?  What was your analysis?  How

12  did you do it?

13  A    I had to determine the difference between what they were

14  able to charge for the projects, what they actually charged,

15  and what they would have been able to charge absent any

16  wrongful conduct.

17  Q    How did you determine, for your analysis, what they could

18  have charged?

19  A    If you look back to this chart, you'll see, here's the 15

20  projects.  The start date is listed, and so, if you look at the

21  start date, you'll see that the STC project was started in 2009

22  and then there was other projects, but, in 2009 there is no

23  alleged wrongful conduct that was taking place in Mexico, so

24  that is an unimpacted project.

25            And so, to determine what the Government approved

1   price is, or the price that they would be allowed to charge

2   absent any wrongful conduct, I use STC as a proxy for that.

3   Q    And, for the four projects we're talking about here, one,

4   two, three, four, CAPUFE, the SIOP one and two and the GFB,

5   does this document also show the polymer price charged on the

6   project?

7   A    Yes, this is as good a time as any to make sure that we're

8   clear on the price, and some of the documents are going to be

9   in pesos and in kilograms, and some of the documents are in

10  dollars and pounds.  In this case, it does show the price of

11  those projects in pesos per pound.

12              THE COURT:  Pesos per pound?

13              THE WITNESS:  Thank you, Your Honor.  Pesos per

14  kilogram, I misspoke.

15              MR. VILLARREAL:  I was about to (indisc.).

16  BY MR. VILLARREAL:

17  Q    Up here, it says it's polymer price, Mexican dollar, which

18  is pesos, I'm sorry, Mexican pesos per kilogram.

19  A    That's correct.

20  Q    And you figured out these numbers that are in this list,

21  how?

22  A    By looking at the contracts of those and looking at the

23  bid documents and seeing the financial information that is

24  associated with those projects.

25  Q    So, now you figured out the approved Government price that

1  you're using for your analysis and you've identified the four

2  projects that you say were impacted.  What you do next?

3  A    I compared what the actual price is and you can see on

4  those four projects it's below what the approved price is of

5  735.34 pesos per kilogram, and, through a longer process, take

6  the difference between that to determine the additional

7  revenues they could had received, had they been able to charge

8  the Government approved price.

9  Q    Did you ultimately come up with a number in dollars?

10 A    I did.

11 Q    How's you get that?

12 A    We first of all had to convert the pesos per kilograms

13 into dollars per pound, and that will change.  I think it's

14 important to note that the reason I'm comparing the pesos per

15 kilogram here is, although, when you go from kilograms to

16 pounds, that number's never going to change, but when you go

17 from pesos to dollars, it may not always be the same because

18 the foreign exchange rate changes on a day to day basis.

19      So, I have to make sure when I take the 735.34 pesos

20 per kilogram, I have to look at what point in time I convert

21 that to US dollars.  So, you may see different dollars.  They

22 won't be consistent because I'm converting those at different

23 points in time, but, if you went back to the peso, it would be

24 the same.

25 Q    Okay, so now you've converted everything from pesos per

Blacker - Direct / By Mr. Villarreal                    71

1   kilogram to dollars per pound.  What'd you do next?

2   A    Each of those projects are invoiced in part on the amount

3   of polymers that they used.  So, I calculate, I guess even

4   before we got there, I calculated the difference between the

5   approved price in the actual price.

6          So, I have that figure and then I can multiply it

7   times the number of pounds of polymers that are used on each

8   project and that will give me the incremental revenue, or the

9   revenue that Urelift lost.

10  Q    And, did you ultimately do that with all of these?  Did

11  you come up with the lost revenue numbers?

12  A    I went through that process for each of those four and

13  summed them together.

14  Q    And, once you get your revenue, are you done?

15  A    No, that's lost revenue, then, the claim is lost profits.

16  So, you have to look and see, okay, the revenues were lost, but

17  would there be any incremental cost needed to generate, then

18  you would subtract out to get to lost profits.

19          In this case, the answer is the incremental cost

20  would be zero, because they completed the projects.  They

21  already incurred the cost.

22          So, you're in essence taking lost revenues minus

23  zero, but, we want to get to lost profits.

24  Q    So, after going through all of this process, reviewing the

25  documents, converting things, what ultimately was your opinion

Blacker - Direct / By Mr. Villarreal                72

1  in regard to damage type, I'll call it number one?  Did you

2  come to an opinion --

3  A    I did.

4  Q    -- as to what the lost profits for the four completed

5  projects you looked at that way?

6  A    Yes, I did.

7  Q    And what was the total amount?

8  A    It's $6.11 million.

9  Q    And, is that what's shown there?

10  A    Yes, it is.

11           **MR. VILLARREAL:**  (indisc.)

12           **THE COURT:**  Yes, let's break for lunch before we

13  start a new topic.  Let's be back at ten after the hour, ten

14  after one and we'll resume.

15       **(Recess for lunch from 11:53 a.m. to 1:13 p.m.)**

16       **(Case resumed)**

17       **(Jury enters)**

18           **THE COURT:**  All right, good.  Everyone be seated.

19  Mr. Villarreal.

20           **MR. VILLARREAL:**  Thank you, Your Honor.

21                **DIRECT EXAMINATION (CONTINUED)**

22  **BY MR. VILLARREAL:**

23  Q    Mr. Blacker, before the break, this is where we were.  You

24  had given your opinion with respect to lost profits on

25  completed projects with reducing their prices. Remember that?

1    A    I do remember that.

2    Q    And it just to refresh everyone, that relates to Exhibit

3    140, those four projects listed right there, correct?

4    A    That's correct.

5    Q    Now, I want to go to the next damage type.  Down there,

6    right here, for lost profits for STC Metro Linea A.  You with

7    me?

8    A    I am.  That's the next category of lost profits, yes.

9    Q    Did you do an analysis of lost profits related to the STC

10   Metro Linea a project?

11   A    I did.

12   Q    What do you understand the Metro STC or the STC Metro

13   Linea A project?

14   A    That's the project that we've heard a lot about in the

15   last two days here in the courtroom.  It was the project that

16   ALSO and Urelift, and a third party bid on, it was awarded to

17   ALSO.

18   Q    Did you review documents related to that project?

19   A    I did.

20   Q    How many?

21   A    Thousands, literally, there are financial documents

22   associated with the bid, the contract.  I guess specifically

23   for Metro Linea A, it may not be thousands, but in the totality

24   of what I look at, it was thousands, but it was a voluminous

25   amount of documents.

Blacker - Direct / By Mr. Villarreal                74

1   Q    Now, going through those records, did you ultimately

2   determine or find that Urelift lost profits as a result of

3   losing that project?

4   A    I did calculate the profits they would have earned had

5   they been awarded that project.

6   Q    And, we talked earlier about a preferred Government price

7   or agreed Government price that you used as the base for the

8   lost profits on completed projects, the one you say came from

9   this Exhibit 140 of 73534?

10  A    That's correct.

11  Q    Did that number play a role in your analysis for the STC

12  Metro Linea A project?

13  A    That is the number that I used, under the assumption that

14  the parties are performing under the contract as written, but,

15  there would be no interference, no wrongful conduct, no

16  competition from Uretek in Mexico and that the Government

17  approved price would have been awarded to Urelift and that that

18  project would have been awarded to Urelift, absent the wrongful

19  conduct.

20       So, it's an assumption that I'm making as far as

21  liability and that is the number that I'm using as to the

22  amount of revenues they would have earned, the Government

23  approved price, on that project, when they would have received

24  that project as a direct bid, rather than a competitive bid.

25  Q    And, as part of your analysis and your review of the

Blacker - Direct / By Mr. Villarreal                    75

1    documents and thousands of pages, did you have to do the same

2    conversions from the Mexican peso and kilograms, with this

3    particular project as well?

4    A    Had to go through the same calculations.  We start with

5    pesos and kilograms, had to move to US dollars and pounds, yes.

6    Q    Did you have to identify how much polymer was going to be

7    needed and stuff like that?

8    A    That's a component, a very large component of how those

9    projects are bid, is on the amount of polymer that would be

10   used on a project.  So, then you would need to figure out the

11   revenues associated with the polymers, also the cost associated

12   with the polymers.

13   Q    So, with respect to -- the way you determine revenue, you

14   talked about earlier, you simply subtract the different prices,

15   I guess the revenue was something you discussed with the

16   reduced bid, so now, you mentioned costs.  What cost did you

17   consider with respect to this lost project?

18   A    So, I mean, it's the same formula.  What are the revenues

19   that they lost, that Urelift lost, by not being awarded the

20   Metro Linea A project.  They would have had to perform and do

21   the work and that would cost money.  What are the expenses that

22   they would have incurred in order to generate those revenues?

23        And then you start with total revenues, subtract the

24   incremental expenses to determine what is left over, the lost

25   profits.

Blacker - Direct / By Mr. Villarreal                    76

1  Q    Did you do that in this case?

2  A    I did that in this case, yes.

3  Q    And after completing all the revenue analysis and figuring

4  out the lost revenue and then reducing the costs from there,

5  did you ultimately come up with an opinion as to what the lost

6  profits for Urelift were for the STC Metro Linea A project?

7  A    Yes, I did.

8  Q    And, what was that opinion?

9  A    Approximately $4.31 million in lost profits.

10 Q    And is that what we have right there?

11 A    That's correct.

12 Q    Now, the next list on here says lost profits for lost

13 project and it says Chapultepec.  Did your documents raise that

14 -- well, first of all, were you asked to look at that project

15 to see if there were lost profits for Urelift?

16 A    Yes, I was asked to evaluate that project.

17 Q    And, did you do that?

18 A    I did.

19 Q    And, what's your understanding of what the Chapultepec

20 project is?

21 A    That project is a project that was directly awarded to

22 ALSO, and that Urelift did not have an opportunity to even bid

23 on the project.  I'm assuming that had the parties performed

24 under the exclusive sublicense agreement, it would have been

25 Urelift that would have gotten the direct award to that

1   contract, since they have the rights to the Uretek processes

2   and products.  The exclusive rights.

3   Q    And what document did you look at, or what documents --

4   did you review documents related to the lost profits of that

5   project in Chapultepec?

6   A    I did.  There's a difference between the information

7   that's available to me for Metro Linea A, because they actually

8   bid on the project.  When we get to Chapultepec, they didn't

9   have an option to even bid, so Urelift wouldn't have any

10  documents for me to review, but ALSO had information associated

11  with that project.

12         So, I reviewed documents produced by the defendants

13  and associated with ALSO and its performance on the contract,

14  and, I can use that information to determine what lost profits

15  would have been to Urelift had they been awarded the project.

16  Q    And what was the base price you used for polymers in that

17  case?

18  A    Again, if the parties are performing under this exclusive

19  sublicense agreement, it would have been the Government

20  approved project of 735.34 pesos per kilogram.

21  Q    And, did the documents you reviewed from ALSO identify the

22  rest of the information you needed to complete your analysis,

23  and, did it have, you know, the amount of polymers necessary,

24  the base cost and the work to be done, etcetera?

25  A    Yes, it did.  So, I could look at the polymers that ALSO

Blacker - Direct / By Mr. Villarreal                78

1    used on the project to get the lost revenues for Urelift by

2    taking the polymers times the Government approved price.

3    Q    Now, you also had to do the various conversions from pesos

4    to dollars and kilograms to pounds for this (indisc.)?

5    A    Yes, I did those conversions.

6    Q    And, after doing those conversions and your review of the

7    contract and those various things, did you ultimately come to

8    an opinion as to the lost profits related to the lost project

9    of Chapultepec for Urelift?

10   A    I did.  We've talked about the lost revenues, but I also

11   had to estimate the cost to be able to subtract from that.  And

12   so, what I was able to do, is I had 15 other projects that they

13   worked on, and I was able to look and see on average, the cost

14   as a percentage of the revenues on those other projects.

15          So, then I could, I did that analysis, but I also

16   looked to see what the cost of the polymers, so I had to

17   subtract what the cost of the polymers, and so, once I got the

18   expenses, I could subtract it from the revenues to get down to

19   lost profits.

20   Q    We did you get the cost of the polymers?

21   A    Documents produced in this case.  Again, if the parties

22   were performing under the contract, I was assuming that Urelift

23   would have purchased those from Uretek, at the agreed-upon

24   price, which Uretek, in the sublicense agreement, agreed to

25   sell to Urelift, the polymers at cost plus a fifty percent

1   markup and then in Mexico, what was similar to sales tax in the

2   US, but then, if you add up what the total cost was, so I was

3   assuming that Urelift purchased the polymers from Uretek under

4   that formula.

5   Q    And, after applying all of that analysis, did you

6   ultimately come to an opinion as to what lost profits were for

7   Urelift with regards to the Chapultepec project?

8   A    I did.

9   Q    And what was that opinion?

10  A    That had Urelift performed on the Chapultepec project,

11  they would have earned profits of $2.65 million.

12  Q    Is that what's shown on the screen for you?

13  A    Yes, it is.

14  Q    Could we have one last row?  It says damages type,

15  contractual damages, UdeM on the left-hand side, right here.

16  Do you see that?

17  A    I do.

18  Q    What does that signify?

19  A    The contractual damages are based on the contractual

20  agreement, the exclusive sublicense agreement.

21       **(Off the record)**

22  **BY MR. VILLARREAL:**

23  Q    And, I'm putting Exhibit Four up on the screen.  And,

24  Mr. Blacker, have you seen this before?

25  A    I have.

1  Q    And, is it in particular subsection B that you're looking

2  at, it says prohibits sales of Uretek processes to customers

3  outside of territory?

4  A    That's exactly the section that am referring to.

5  Q    Okay.  So, with respect to that -- .  Okay, so for the

6  contractual damages, generally speaking, what did you do?

7  A    The contractual damages as set forth in the sublicense

8  agreement says that any sales into Mexico that didn't go to

9  Urelift, Urelift would be entitled to fifty percent of those

10 sales.

11        I was provided by counsel a number of invoices that

12 shows that SPI, the company we heard about earlier, made sales

13 into Mexico.  So, I was given those invoices and asked to add

14 those up.

15 Q    After you add them up, what did you do?

16 A    According to the contract, I multiplied it by fifty

17 percent to determine what the contractual damages would be.

18 Q    After completing that, did you come to an opinion as to

19 what the contractual damages to UdeM are?

20 A    I did.  I have to say that I did the addition of those

21 invoices in 2017 when I issued my report.  So, we had invoices

22 up through 2016 at the time I did that.  I've heard testimony

23 in the courtroom, even today, that SPI was selling into Mexico.

24 I haven't seen those invoices, so I'm limited to just the

25 invoices that I was provided and I did add those up and then do

1  the math and determined what the contractual damages would be,

2  even if it's incomplete.

3  Q    So, we haven't asked you to add anything past what the

4  original opinion was that you gave, correct?

5  A    That is my point, yes.  It ended in a shorter period of

6  time than through today.

7  Q    So, what is your opinion as to the contractual damages

8  that you were asked to look at?

9  A    That is the contractual damages are $1.46 million.

10  Q    And, does what's on the screen accurately reflect your

11  opinions as to damages related to those various damages type?

12  A    Yes, that's correct.

13          **MR. VILLARREAL**:  I'll pass the witness, Your Honor.

14          **THE COURT**:  All right.  We are going to resume

15  tomorrow.  All right.  So that concludes the testimony for

16  today.  We will see you back tomorrow, 9 o'clock.  We'll finish

17  cross examination of this witness and finish up the case.  All

18  right?  All rise for the jury.

19          **(Jury exits)**

20          **THE COURT**:  All right.  So, I'm going to start

21  finishing up the jury instructions and I know you haven't made

22  your Rule 50 motions yet, but you are proceeding on breach of

23  contract for the non-compete.

24          **MR. VILLARREAL**:  Yes, Your Honor.  Plus, interference

25  with respective relation.

1      **THE COURT:**  Are you seeking breach of contract on the

2  nondisclosure?

3      **MR. VILLARREAL:**  No, Your Honor.  We're not

4  (indisc.).

5      **THE COURT:**  Okay.  And then tortuous interference

6  with prospective?

7      **MR. VILLARREAL:**  Yes, Your Honor.

8      **THE COURT:**  And that would be on Metro Linea A?

9      **MR. VILLARREAL:**  And the Chapultepec project.

10      **THE COURT:**  Chapultepec.  Just those two?

11      **MR. VILLARREAL:**  Those are the prospective contracts

12  identified, Your Honor, yes.  Excuse me.

13      **THE COURT:**  And so, for damages on the non-compete,

14  you've got the contract damages for UdeM?

15      **MR. VILLARREAL:**  Yes, Your Honor.  And the reduced.

16      **THE COURT:**  And the reduced?

17      **MR. VILLARREAL:**  Yes, Your Honor.

18      **THE COURT:**  All right.  Good.  Is there anything else

19  we need to talk about?  If not, I'll see you all tomorrow.

20      **MR. VILLARREAL:**  Thank you, Your Honor

21      **(Court adjourned 1:33 p.m.)**

22

23

24

25

83

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

April 5, 2019

           Signed                              Dated

*TONI HUDSON, TRANSCRIBER*