IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

URETEKNOLOGIA DE MEXICO S.A. §
DE C.V., et al., §
§
    Plaintiffs, §
§
v. §     CIVIL ACTION NO. H-16-2762
§
URETEK (USA), Inc., et al., §
§
    Defendants. §

## MEMORANDUM OPINION

Pending before the court is Defendant Uretek (USA)'s ("Uretek") Motion for Judgment as a Matter of Law (Doc. 121), the response thereto, and Uretek's reply. For the reasons discussed below, the motion is **GRANTED IN PART AND DENIED IN PART**.

### I. Case Background

This case is the second of two related business disputes between these parties to go to trial.

### A. Prior Litigation

Uretek owns the rights to a patented technology for concrete rehabilitation and repair using expansive polyurethane foam and a deep injection process.[1] A 2003 Sublicense Agreement with Ureteknologia de Mexico S.A. de C.V. ("UdeM") allowed UdeM to exclusively market the Uretek processes and products in Mexico.[2] A number of disputes arose concerning the parties' respective

---

[1] See Uretek (USA) v. Ureteknologia de Mexico, 589 F. App'x 710, 711 (5th Cir. 2014).

[2] See id.

performances under that Sublicense Agreement, and a lawsuit was filed by Uretek in July 2011.[3] In that lawsuit, Uretek complained that UdeM breached the contract by failing to purchase a minimum amount of products and services; UdeM argued that these alleged breaches were excused by later agreements between the parties.[4]

The case was tried to a jury in April 2013.[5] The jury found that: (1) Uretek failed to show that it was fraudulently induced to enter into a June 2010 Amendment to the 2003 Sublicense Agreement; (2) Uretek agreed to the June 2010 Release; and (3) Uretek ratified both the June 2010 Amendment to the 2003 Sublicense Agreement and the June 2010 Release.[6] Based on these answers, the jury did not reach Uretek's liability questions concerning whether UdeM breached the 2003 Sublicense Agreement by failing to purchase certain amounts of polyurethane in 2010 and by failing to pay full price for services rendered by Uretek in 2009.[7]

Uretek appealed the court's final judgment.[8] On October 29,

---

[3] See Uretek (USA) v. Ureteknologia de Mexico, Civ. Action No. H-11-3060, Doc. 1, Not. of Removal.

[4] See Uretek (USA) v. Ureteknologia de Mexico, Civ. Action No. H-11-3060, Doc. 39, Jt. Pretrial Ord. pp. 1-2.

[5] See Uretek (USA) v. Ureteknologia de Mexico, Civ. Action No. H-11-3060, Doc. 49-51, Min. Entries for Trial Proceedings.

[6] See Uretek (USA) v. Ureteknologia de Mexico, Civ. Action No. H-11-3060, Doc. 57, Jury Questions.

[7] See id. pp. 6-7.

[8] See Uretek (USA) v. Ureteknologia de Mexico, Civ. Action No. H-11-3060, Doc. 71, Notice of Appeal.

2014, the Fifth Circuit Court of Appeals affirmed the take-nothing judgment.[9]

## B. **Present Litigation**

On September 13, 2016, Plaintiffs UdeM and Urelift S.A. de C.V. ("Urelift"), both Mexican corporate entities, filed this contract and tort action alleging that Structural Plastics, Inc., ("SPI"), entered a scheme with Uretek, Brent Barron ("Barron"), president of Uretek, and Randall Brown, vice president of Uretek, to use SPI as a conduit to "circumvent, breach, interfere with and/or baldly disregard the terms" of the 2003 Sublicense Agreement by selling Uretek products and processes into Mexico to competitors of UdeM and Urelift.[10] SPI is owned by Mindy and Galen Howard, the daughter and son-in-law of Barron.[11]

The parties tried this case to a jury in March 2019 on four issues related to whether Uretek breached the 2003 Sublicense Agreement's covenant not to compete by: (1) selling its products or application services in Mexico; (2) engaging in any other enterprise that would reduce the value of the Uretek processes or the rights granted to Plaintiffs; (3) selling or causing to be sold the Uretek processes or products in Mexico; and (4) violating the

---

[9]    See Uretek (USA) v. Ureteknologia de Mexico, 589 F. App'x at 710.

[10]    See Doc. 1, Pls.' Orig. Compl. p. 3; see also id. p. 4. Plaintiffs alleged a number of claims that were either dismissed by summary judgment or voluntarily relinquished by not submitting them to the jury.

[11]    See Tr1. 114, 119-20.

exclusive sublicense granted to UdeM and Urelift for Mexico.[12]  The
jury answered affirmatively on all four liability questions.[13]

Turning to damages, the jury awarded UdeM liquidated damages
in the amount of $1,460,000 and awarded Urelift $6,110,000 in lost
profits on four completed projects, $2,650,000 in lost profits on
an unrealized contract for the Chapultepec project, and $4,310,000
in lost profits for an unrealized government contract for soil
stabilization on a line of Mexico City's Sistema de Transporte
Colectivo ("STC"), a project commonly referred to as "Metro Linea
A."[14]  Uretek challenges the jury's verdict on damages.

## 1.  The Evidence Relevant to Damages

Testimony relevant to damages was provided by Francisco
Alvarez ("Alvarez"), Barron, Galen Howard, Luis Sosa ("Sosa"), and
Bruce Blacker ("Blacker").

### a.  Alvarez's Testimony

Alvarez created UdeM and Urelift.[15]  UdeM is the holding
company that owns a part of the stock of Urelift, and Urelift is a
"one stop company where we analyze in depth all geotechnical,
geophysical issues related to problems with soils, rocks, stability

---

[12]     See Doc. 111, Jury Instructions, p. 5.

[13]     See Doc. 111-2, Jury Verdict p. 1.

[14]     See id. p. 2.

[15]     See Doc. 114, Tr. Dated Mar. 25, 2019 ("Tr1.") 59.

of structures."[16] UdeM is licensed to use the Uretek process and products in Mexico based on the 2003 Sublicense Agreement with Uretek.[17] The Uretek process stabilizes soil underneath bridges, buildings, monuments and other structures that have been sinking over time by injecting polymers into the ground.[18] UdeM did not perform any work utilizing the rights in the sublicense agreement; all work utilizing the licensed Uretek process was performed by Urelift.[19]

In 2009, Urelift received a "sole source" designation through which it sold the Uretek process to a government department at a price, 735.34 pesos ($21.90) per kilogram, that was approved by a government commission.[20] Urelift also obtained non-sole-source contracts: (1) Caminos y Puentes Federales de Ingresos y Servicios Conexos ("CAPUFE") with a start date in October 2013; (2) Secretaria de Infrastructura y Obra Publica ("SIOP") #1 with a start date in December 2013; (3) SIOP #2 with a start date in

---

[16] See id. On cross-examination, Alvarez explained that he owned five percent of UdeM directly and a company called NDT owned the remaining ninety-five percent. Tr1. 132. Alvarez owned more than fifty-percent of NDT. Tr1. 133. NDT owned twenty percent of Urelift; UdeM owned thirty percent of Urelift; and Paharpur owned the remainder. Id. Urelift and UdeM had a single executive officer. Tr1. 134. Alvarez does not hold a formal position with UdeM. Id. At the time of trial, Alvarez owned close to ninety-nine percent of Paharpur. Tr1. 135.

[17] See Tr1. 63. Urelift may use other, unlicensed processes as Alvarez stated, "We try to focus on the Uretek Urelift process for most of what Urelift does." Tr1. 60.

[18] See Tr1. 65.

[19] See Tr1. 64.

[20] See Tr1. 69-70, 94.

August 2014; and (4) Grupo Fiananciero Banorte S.A. de C.V. ("GFB") with a start date in May 2015.[21] All of these competitively bid projects were awarded at polymer prices of less than 735.34 pesos per kilogram.[22] Alvarez admitted that with the exception of the first contract, Urelift did not utilize any Uretek product for any subsequent project after 2009, and acquired polymers from other companies, despite representing to customers that it was using Uretek products.[23]

Alvarez testified, over objection, that these four clients refused to deem their respective contracts as sole-source contracts and required Urelift to bid on these projects because there was competition in the marketplace.[24] The jury was instructed to disregard the hearsay testimony of what Alvarez's clients told him about competition.[25] Alvarez reduced Urelift's bid price to 223.55

---

[21] See Tr1. 95; Doc. 121-1, Annex 8 to Def.'s Mot. for J. as a Matter of Law, Pl.'s Trial Ex. 140, Summary of Projects. In the trial transcript, SIOP #1 and SIOP #2 are referred to as "CF1" and "CF2," apparently as a result of mistaken phonetical spelling. Compare Tr1. 95 with Doc. 121-1, Annex 8 to Def.'s Mot. for J. as a Matter of Law, Pl.'s Trial Ex. 140, Summary of Projects.

Notably, in seven of the fifteen contracts found on the Summary of Projects, Urelift was able to charge a polymer price in excess of the sole-source amount of 735.34 pesos per kilogram of polymer. See Doc. 121-1, Annex 8 to Def.'s Mot. for J. as a Matter of Law, Pl.'s Trial Ex. 140, Summary of Projects. Two of those contracts (CHIAPAS #1 and #2) were after ALSO entered the marketplace. Id.

[22] See Tr1. 95

[23] See Tr1. 144, 157.

[24] See Tr1. 95-96.

[25] See Tr1. 96. Despite that admonishment, Alvarez continued to refer to hearsay information concerning competition over objection by Defendants. See Tr1. 98-99.

pesos per kilogram for the CAPUFE project, 612.37[26] pesos per kilogram on SIOP #1, 294.23 pesos per kilogram for SIOP #2, and 628.73 pesos per kilogram on the GFB contract.[27] He stated that he showed the clients the document in which another government agency had deemed Urelift's licensed process as "sole source," and was asked by his counsel, "Did that change their mind?"[28] He responded:[29]

A. It did. It did but we had to sacrifice pricing.

Q. At that time[,] did you know who was competing with you -

A. No.

Urelift lost more than thirteen million pesos in 2015 based on competition per Alvarez.[30] Alvarez was again asked who was Urelift's competition in 2015.[31] The following dialog ensued:

Q. Competition from who[m]?

A. I don't have proof of the competition.

Q. Oh, well you don't - you had competition you don't know who it was?

---

[26] The trial transcript reflects that the amount of the bid for SIOP #1 was 612.47 pesos, but the trial exhibit reflects that the amount was 612.37 pesos. Compare Tr1. 97 with Doc. 121-1, Annex 8 to Def.'s Mot. for J. as a Matter of Law, Pl.'s Trial Ex. 140, Summary of Projects.

[27] See Tr1. 97-98.

[28] See Tr1. 99.

[29] See id.

[30] See Tr1. 160.

[31] See id.

A.  I know who it was.

Q.  You have no proof of who?

A.  No.

Q.  True?  True you have no proof?

A.  I don't have proof.  Sorry.  Yes, there is proof. There is proof.

Q.  Well is it -

A.  There is proof that we found out about that in 2017.

Q.  Can you point me to a document that proves that you had competition for that [second] job?

A.  I'm looking for the document[,] and it is part of this trial, and I will look for it.

Q.  But you don't know who the competitor was, correct?

A.  I do.

Q.  Well do you have proof that you had a competitor for that job?

A.  When I find the document, I will not do hearsay[;] I will prove it with the document.[32]

However, the trial ended without any document being produced by Urelift to support Alvarez's testimony that he knew who Urelift's competition was before 2016.

In May 2016, ALSO Construccion y Supervision ("ALSO"), which was owned by Sosa and Abel Guzman ("Guzman"), a former independent

---

[32]    Tr1. 160-61.

contractor for Urelift, was awarded a sole-source bid on the Chapultepec project.[33] Alvarez affirmed that, had Urelift been permitted to submit a bid on that project, it would have.[34] The court sustained the objection to the follow-up question asking whether Alvarez believed Urelift would have been awarded the contract if allowed to bid because the question called for speculation.[35]

In July 2016, Urelift was an unsuccessful bidder on Mexico City's Metro Linea A project.[36] Alvarez obtained documents through a public record request in Mexico that showed that ALSO was awarded the Metro Linea A project. The two unsuccessful bidders, Urelift and Comsa Emte, S.A. de C.V. ("Comsa Emte"), were both disqualified for not fulfilling either the legal requirements, the technical requirements, or the economic requirements set out in the bid package.[37] In a letter dated July 27, 2016, Urelift was advised of fourteen specific reasons its bid was rejected by Mexico City.[38] The reasons ranged from undercapitalization to costs that exceeded

---

[33]    See Tr1. 100, 117-18; Doc. 124-1, Annex 14 to Pls.' Resp. to Def.'s Mot. for J. as a Matter of Law, Pl.'s Trial Ex. 124, Chapultepec Direct Award.

[34]    See Tr1. 117-19.

[35]    See Tr1. 119.

[36]    See Tr1. 139.

[37]    See Tr1. 106; Doc. 121-1, Annex 10 to Def.'s Mot. for J. as a Matter of Law, Def.'s Trial Ex. 2, Adjudication Statement.

[38]    See id.; see also Doc. 121-1, Annex 11 to Def.'s Mot. for J. as a Matter of Law, Def.'s Trial Ex. 23, Letter from Mexico City to Urelift Dated July 27, 2016.

the market price.[39] Of the three bids considered on the project, ALSO's bid was the lowest ($51,578,440.41 pesos) and Urelift's was the highest ($122,613,104.18 pesos).[40]

One document supporting ALSO's successful bid on the Metro Linea A project was a July 20, 2016 letter addressed to ALSO from SPI with a letter attached from Uretek confirming that SPI could purchase Uretek's stabilizing products for the injection services.[41]

At a later time, Alvarez was asked:[42]

Q.  So all we can say today is that you may have had competition before ALSO, but you didn't know what that - who that competition was?

A.  Would you like to rephrase your question?

Q.  Well you can't say you didn't have competition in Mexico prior to ALSO, can you, sir?

A.  Yes, we have competition.

Alvarez reviewed Trial Exhibit 140,[43] a list of contracts

---

[39]    See Doc. 121-1, Annex 11 to Def.'s Mot. for J. as a Matter of law, Def.'s Trial Ex. 23, Letter from Mexico City to Urelift Dated July 27, 2016 pp. 65, 67.

[40]    See Doc. 121-1, Annex 10 to Def.'s Mot. for J. as a Matter of Law, Def.'s Trial Ex. 2, Adjudication Statement p. 54.  Comsa Emte's bid was $107,251,503.37 pesos.  Id.

[41]    See Tr1. 107, 109-10; Doc. 124-1, Annex 15 to Pls.' Resp. to Def.'s Mot. for J. as a Matter of Law, Pl.'s Trial Ex. 125, Letter Dated July 20, 2016, from SPI to ALSO & Letter Dated July 13, 2016, from Uretek to SPI.

[42]    See Tr1. 138.

[43]    See Doc. 121-1, Annex 8 to Def.'s Mot. for J. as a Matter of Law, Pls.' Trial Ex. 140, Summary of Projects.

Urelift obtained between 2009 and 2016 and agreed that all were sole source contracts obtained without competition.[44] Nonetheless, Alvarez stated that Urelift had to reduce its pricing on some contracts because there was "competition."[45] When asked who was the competition, Alvarez stated, "Unknown companies. Very small companies that had nothing to do with stabilization of soils and they lost."[46] When pressed, "It was not ALSO?" Alvarez stated, "No."[47]

Of the contracts awarded to Urelift, only the 2009 STC project used Uretek's Star 486 patented polymer.[48] For the others, Urelift obtained polymers from other companies in the United States and Europe that were as good as or better than Uretek's polymer.[49]

     b.  <u>Barron's Testimony</u>

Barron testified that UdeM was the only entity Uretek licensed to use the patented Uretek processes and methods in Mexico.[50] SPI had the right to sell other non-patented polymer products into Mexico commencing in January 2013; SPI was prohibited from selling

---

[44]  <u>See</u> Tr1. 143.

[45]  <u>See</u> <u>id.</u>

[46]  <u>See</u> <u>id.</u>

[47]  <u>See</u> Tr1. 143-44.

[48]  <u>See</u> Tr1. 144.

[49]  <u>See</u> <u>id.</u>

[50]  <u>See</u> Tr1. 175.

any product obtained from Uretek in the United States.[51]  Barron
admitted that he was in contact with Sosa of ALSO in May 2014
concerning a Metro project and that he had supported ALSO's later
bid on Metro Linea A.[52]  Barron stated that the ALSO bid used an
Acella product and process and did not use a Uretek product and
process.[53]

Barron generally denied knowing the projects on which ALSO was
bidding, with the exception of Metro Linea A.[54]  Regarding Metro
Linea A, Sosa sent Barron several informative emails in 2014 and
2015 concerning ALSO's efforts to obtain the bid.[55]  Barron sent a
letter to Metro on July 20, 2016, informing it that in his opinion
Urelift did not do good work and that Urelift claimed to be using
Uretek products that it did not actually use.[56]  While SPI was the
nominal seller of the polymer to ALSO, Uretek completed the
paperwork attendant to that proposed sale.[57]

Barron denied providing technical support for ALSO in its bid

---

[51]    See Tr1. 179, 181.

[52]    See Tr1. 189, 192-93.

[53]    See Tr1. 193-94.

[54]    See Doc. 115, Tr. Dated Mar. 26, 2019 ("Tr2.") 9, 17; but see Doc.
124-1, Annex 7 to Pl.'s Resp. to Def.'s Mot. for J. as a Matter of Law, Pl.'s
Trial Ex. 24, Email Dated Aug. 1, 2016, from Sosa to Barron (referencing the
Chapultepec project).

[55]    See Tr2. 35-38, 50-56.

[56]    See Tr2. 69; see also Pls.' Ex. 135.

[57]    See Tr2. 71-72, 77, 83-84.

for the work on Metro Linea A and explained that between 2009 and 2011, Uretek trained Guzman in the Uretek process when Guzman worked for Urelift but did not train any ALSO employees.[58]  Uretek also built the injection unit purchased by ALSO from SPI for the 2016 project on Metro Linea A; and, when it broke, Uretek provided repair support.[59]

### c. Galen Howard's Testimony

Galen Howard, the president of SPI, testified that SPI sold polymers obtained from Uretek to a number of companies based in Colombia, Korea, Panama, and Canada, as well as to ALSO in Mexico.[60]

### d. Blacker's Testimony

Blacker, a Certified Public Accountant, was retained to quantify Plaintiffs' damages.[61]  Blacker was asked to consider whether UdeM was entitled to liquidated damages if Uretek was found to have breached the contract by selling its products in Mexico and whether Urelift sustained lost profits.[62]

Regarding liquidated damages, Blacker relied on the provision of the amended sublicense agreement that awarded liquidated damages at fifty percent of any sales that violated the non-compete

---

[58]  See Tr2. 78, 121-22.

[59]  See Tr2. 79-80, 82, 120.

[60]  See Doc. 116, Tr. Dated Mar. 27, 2019 ("Tr3.") 26-28.

[61]  See Tr3. 58-59.

[62]  See Tr3. 65.

provision.[63]  Using the SPI invoices, Blacker calculated that UdeM was entitled to $1,460,000 in damages.[64]

Blacker also considered fifteen completed contracts awarded to Urelift between December 2009 and March 2016 and identified four on which Urelift sustained lost profits.[65]  Those projects were CAPUFE, SIOP #1, SIOP #2, and GFB.[66]  Blacker looked at the difference between what Urelift actually charged for the project and what it would have been able to charge, absent any wrongful conduct by Uretek.[67]  Blacker testified that he assumed that the appropriate price per kilogram was that found in the 2009 STC "sole source" project.[68] He also assumed that the costs for each project would have remained the same.[69]  Blacker calculated that, if Urelift had been able to charge 735.34 pesos per kilogram for those four contracts, it would have netted an additional $6,110,000.[70]

Blacker also found that Urelift was entitled to lost profit damages on the Chapultepec project based on Alvarez's testimony

---

[63]    See Tr3. 80.

[64]    See Tr3. 81.

[65]    See Tr3. 63, 67, 72.

[66]    See Tr3. 68.

[67]    See id.

[68]    See Tr3. 68-69.

[69]    See Tr3. 71.

[70]    See Tr3. 71-72.

that Urelift was not allowed to bid on it.[71]  Blacker opined that, had Uretek not violated its non-compete obligations under the exclusive sublicense agreement, Urelift, and not ALSO would have been awarded the contract on a non-competitive basis and would have charged 735.34 pesos per kilogram.[72] Blacker calculated that Urelift would have earned profits of $2,650,000.[73]

Turning to Metro Linea A, Blacker assumed that Urelift would have been awarded the contract, that it would have been awarded on a direct, rather than a competitive basis using the $735.34 pesos per kilogram price and, after subtracting "incremental expenses," determined that Urelift would have made $4,310,000 in profits.[74]

On cross-examination, Blacker admitted that he did not know when ALSO began competing using the Uretek process.[75]  Blacker also agreed that he was asked to assume that as early as 2011 that Uretek was breaching the non-compete provision of the sublicense agreement thereby depressing the market price of the polymer.[76] Blacker did not examine the soil stabilization market to determine if companies other than Urelift and ALSO were competing therein and

---

[71]     See Tr3. 76.

[72]     See Tr3. 77-78.

[73]     See Tr3. 79.

[74]     See Tr3. 74-76.

[75]     See Doc. 117, Tr. Dated Mar. 28, 2019 ("Tr4.") 6-8.

[76]     See Tr4. 10-11.

the type of technologies those companies were offering.[77]

    e.  <u>Sosa's Testimony</u>

Sosa testified that he and Guzman co-owned ALSO.[78]  Sosa stated that the first time that ALSO performed any job using polymers purchased from SPI was in late November 2015 and that, prior to that time, ALSO had not submitted a competitive bid on any project.[79]  Sosa testified that, in Mexico, there was no "national price" for polymers.[80]  Sosa explained that the bidding process for Metro Linea A involved a lengthy process of meetings with members of Congress and the head of Metro, culminating in a declaration meeting where bidders had the opportunity to ask questions about the project.[81]  The bid process began in late 2013 to early 2014.[82] Initially, Sosa was representing a large Portuguese company, but, when it did not have a solution for polymer stabilization, he spoke to Barron about the project.[83]  ALSO obtained four smaller contracts since 2016 that related to the SPI agreement.[84]  Sosa stated that ALSO has many competitors, including a company owned by Alvarez's

---

[77]     <u>See</u> Tr4. 15-16.

[78]     <u>See</u> Tr4. 63.

[79]     <u>See</u> <u>id.</u>

[80]     Tr4. 63-64.

[81]     <u>See</u> Tr4. 66.

[82]     <u>See</u> Tr4. 66-67.

[83]     <u>See</u> Tr4. 68-69.

[84]     <u>See</u> Tr4. 72-73.

sister.[85]

## II. Legal Standard

Pursuant to Federal Rule of Civil Procedure 50(b), a party may challenge the legal sufficiency of the evidence supporting the jury's verdict. See Orozco v. Plackis, 757 F.3d 445, 448 (5th Cir. 2014). "A motion for judgment as a matter of law should be granted if there is no legally sufficient evidentiary basis for a reasonable jury to find for a party." SMI Owen Steel Co. v. Marsh USA, Inc., 520 F.3d 432, 437 (5th Cir. 2008).

The evidence and all reasonable inferences must be viewed in the light most favorable to the verdict. Arsement v. Spinnaker Exploration Co., 400 F.3d 238, 248 (5th Cir. 2005). A court may "only reverse if the evidence points so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary conclusion." Douglas v. DynMcDermott Petroleum Operations Co., 144 F.3d 364, 369 (5th Cir. 1998).

## III. Analysis

In the pending motion, Uretek argues that Urelift's expert testimony did not meet Federal Rule of Evidence 702 for reliability, contends that UdeM cannot recover liquidated damages, and challenges Urelift's recovery of lost profits as contrary to Texas law.

---

[85]     See Tr4. 73-75.

17

**A.  <u>Renewed Challenge to Blacker's Testimony</u>**

Under the Federal Rules of Evidence and related case law, an expert's testimony must be both relevant and reliable.  <u>Smith v. Goodyear Tire & Rubber Co.</u>, 495 F.3d 224, 227 (5th Cir. 2007); <u>see also</u> Fed. R. Evid. 702 & advisory committee's note, 2000 Amends. Reliability is the "overarching requirement" and hinges on the sufficiency of the facts or data upon which the opinion is based, the dependability of the principles and methods employed, and the proper application of the principles and methods to the facts of the case.  Fed. R. Evid. 702, advisory committee's note, 2000 Amends.; <u>see also</u> Fed. R. Evid. 702.  The facts upon which an expert's opinion is based may be those of which he was "made aware" or those that he "personally observed."  Fed. R. Evid. 703.  The important characteristic of the facts is that they be of the sort that "experts in the particular field would reasonably rely" in forming an opinion on the subject, not that the facts themselves be admissible.  <u>See</u> <u>id.</u>  "The language 'facts and data' is broad enough" to allow the expert to rely on hypothetical facts supported by the evidence.  Fed. R. Evid. 702, advisory committee's note, 2000 Amends. (citing Fed. R. Evid. 703, advisory committee's note, 1972 Proposed Rules).

The court's determination whether to exclude should not be based on the grounds that it believes one version of the facts over another, only whether the factual basis for the opinion is

sufficient. See id. An opinion that is based on "insufficient, erroneous information," "completely unsubstantiated factual assertions," or "altered facts and speculation designed to bolster a party's position" is not reliable. Moore v. Int'l Paint, L.L.C., 547 F. App'x 513, 515 (5th Cir. 2013)(unpublished)(quoting Paz v. Brush Engineered Mats., Inc., 555 F.3d 383, 389 (5th Cir. 2009), Hathaway v. Bazany, 507 F.3d 312, 319 n.4 (5th Cir. 2007), and Guillory v. Domtar Indus., 95 F.3d 1320, 1331 (5th Cir. 1996)). On the other hand, the trial court's role is not to replace the adversary system or to turn a reliability analysis into a trial on the merits. Pipitone v. Biomatrix, Inc., 288 F.3d 239, 250 (5th Cir. 2002)(citing Fed. R. Evid. 702, advisory committee's note, 2000 Amends.).

The general rule is that the jury may hear the expert's testimony and decide whether the predicate facts are accurate. Moore, 547 F. App'x at 515 (quoting Pipitone, 288 F.3d at 250). "[Q]uestions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cty., State of Miss., 80 F.3d 1074, 1077 (5th Cir. 1996). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."

Fed. R. Evid. 702, advisory committee's note, 2000 Amends. (quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 596 (1993)).

The burden falls on the party producing the expert to establish, by a preponderance of evidence, the predicate for admissibility of expert testimony. See Fed. R. Evid. 702, advisory committee's note, 2000 Amends.; Mathis v. Exxon Corp., 302 F.3d 448, 459-60 (5th Cir. 2002). The trial court has the responsibility of determining whether the proponent has met its burden. Fed. R. Evid. 104(a). The trial judge has "wide latitude in determining the admissibility of expert testimony[;]" yet, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, advisory committee's note, 2000 Amends.; Wilson v. Woods, 163 F.3d 935, 936-37 (5th Cir. 1999)(quoting Watkins v. Telsmith, Inc., 121 F.3d 984, 988 (5th Cir. 1997)).

On December 18, 2017, Defendants first challenged the reliability of Blacker's testimony when they filed a motion to exclude his testimony, arguing, in part, that Blacker "never relie[d] on all the facts, never look[ed] underneath Alvarez'[s] statements and never examine[d] all relevant data."[86] The court analyzed the admissibility of Blacker's opinions in its September 2018 Memorandum Opinion that also addressed multiple motions for summary judgment filed by Defendants.[87]

---

[86]    Doc. 54, Defs.' Mot. to Exclude Blacker's Test. p. 9.

[87]    See Doc. 75, Mem. Op.

On the issue of factual support for Blacker's report, the court expressed concern that he had not been fully transparent as to the sources of the data on which he relied.[88]  Yet, the court found:

> [M]any of the specific flaws cited by Defendants [could] be handled through cross-examination and the presentation of conflicting evidence.  Moreover, Blacker's report [was] not littered with obviously insufficient, erroneous information, completely unsubstantiated factual assertions, or altered facts and speculation.[89]

The court left for trial further scrutiny based on whether a sufficient basis had been laid to allow the jury to consider Blacker's testimony.  Before the trial began, Defendants again challenged Blacker's testimony on motion in limine.[90]  The court again found Blacker's testimony admissible.[91]  Uretek's final challenge to the reliability of Blacker's testimony found its way into the pending motion for judgment as a matter of law.

Post-trial, the court is no longer concerned about the sources of Blacker's data because his testimony resolved any prior lack of transparency.  For example, the 735.34 pesos ($21.90) per kilogram of polymer was derived from the historical amount Urelift had received for prior sole-source or noncompetitive bids.  Blacker

---

[88]    See id. p. 19.

[89]    See id. (internal quotation marks and citations omitted).

[90]    See Doc. 92-5, Attach. 5 to Jt. Pretrial Ord., Defs.' Daubert Mot. in Limine as to the Test. of Blacker.

[91]    See Doc. 105, Ord. Dated Mar. 22, 2019.

discussed the sources of his data and explained his calculations. To the extent that certain assumptions factored into Blacker's calculations, Blacker outlined those assumptions.

The jury performed is role in comparing those assumptions and all other facts underlying Blacker's opinions with the facts proven at trial. To the extent Alvarez served as a source of information, Blacker was entitled to rely on facts of which he had been made aware. Moreover, Uretek had the opportunity to attack the sources of facts and data through cross-examination, not only of Blacker, but of Alvarez as well, on these underlying facts. Uretek fails to show that experts qualified to address lost profits would not reasonably rely on that information.

Ultimately, the jury, whose job it was to decide whether the predicate facts were accurate, found both men to be credible. The court, whose job it is to determine whether Urelift met its burden for admissibility, finds that Urelift presented more than sufficient data and facts at trial to support Blacker's testimony.

Uretek fails once more to demonstrate that Blacker's testimony was inadmissible under Federal Rule of Evidence 702.

**B.  <u>Liquidated Damages</u>**

"[C]ovenants not to compete often include a liquidated damages provision to avoid the difficulty of calculating damages." <u>Blase Indus. Corp. v. Anorad Corp.</u>, 442 F.3d 235, 238 (5th Cir. 2006). Unless "the harm caused by the breach is incapable or difficult of

estimation" and "the amount of liquidated damages is a reasonable forecast of just compensation[,]" the provision is "an unenforceable penalty on its face[.]"  <u>In re Xerox Corp.</u>, 555 S.W.3d 518, 532-33 (Tex. 2018).

On the same day as the execution of the 2003 Sublicense Agreement, Barron signed a letter agreement giving UdeM "the authority to sublicense its representation for URETEK USA, Inc.[,] and the URETEK process" to Urelift and another Mexican entity.[92] In June 2010, Uretek and UdeM executed the First Amendment to Sublicense Agreement, which amended the liquidated damages provision of the original agreement to add:

> In the event URETEK sells services utilizing URETEK PROCESSES to a customer inside the TERRITORY, URETEK shall pay, and agrees to pay, SUBLICENSEE liquidated damages equal to fifty percent (50%) of the gross revenues collected from such customer no later than fifteen days from written notification by SUBLICENSEE of such demand therefor.[93]

Uretek argues that UdeM is not entitled to liquidated damages because: (1) it assigned all of its rights to Urelift; (2) SPI, not Uretek, sold services utilizing Uretek processes; and/or (3) the liquidated damages provision is an unenforceable penalty.

In support of the first argument, Uretek cites the original complaint in this case, which stated "By letter agreement dated March 23, 2003, executed by Uretek, Urelift also obtained all

<hr/>

[92]    Doc. 1-1, Letter Dated Mar. 24, 2003, from Barron to Alvarez.

[93]    Doc. 60-3, Ex. 3 to Pls.' Combined Resp. in Opp. to SPI Defs.' Mots. for Summ. J., First Amendment to Sublicense .

rights under the Sublicense Agreement."[94]  That statement indicates that Urelift, as well as UdeM, acquired the sublicensing rights. More importantly, the letter agreement itself is not an assignment; rather, it is a grant of authority to UdeM to sublicense its representation of Uretek products and processes to Urelift. Neither party has pointed the court to a sublicense agreement between UdeM and Urelift.  No evidence suggests that UdeM assigned any of its rights, particularly its right to liquidated damages, to Urelift.

Uretek's second argument disregards the jury's liability finding that Uretek was selling its products or application services in Mexico.  The jury's verdict was supported by significant evidence.

The third argument, that the provision is an unenforceable penalty, also fails.  Uretek offers one sentence in argument that the harm to UdeM is not difficult to estimate:  "Obviously, Plaintiffs do not believe the damages they seek are incapable or difficult of estimation because they rely on the calculation of Blacker that estimate the damages to the penny."[95]  The court infers, considering that Uretek mentions damages sought by UdeM and Urelift collectively, that Uretek is referring to Blacker's precise calculation of Urelift's damages.  Blacker calculated UdeM's

---

[94]     Doc. 1, Pls.' Orig. Compl. p. 4.

[95]     Doc. 121, Def.'s Mot. for J. as a Matter of Law p. 17.

damages based on the liquidated damages provision. UdeM was not in the same position as Urelift and was not entitled to damages for lost profits. Nevertheless, UdeM's exclusive right to sell Uretek products and processes in Mexico had value and was breached by Uretek. The diminishment of value caused by Uretek's breach is difficult to ascertain because UdeM's benefit is not direct, but a percentage of gross sales is a reasonable forecast of just compensation. Phillips v. Phillips, 820 S.W.2d 785 (Tex. 1991), which held that a liquidated damage provision that provides damages in the amount of several times an award of actual damages, is not applicable here because this provision here has a rational basis, not an arbitrary, punitive multiplication of actual damages.

The jury award to UdeM of liquidated damages in the amount of $1,460,000 stands.

## C. **Lost Profits**

In Texas, the recovery of lost profits does not require that the loss be susceptible to an exact calculation but the loss must be shown by competent evidence with reasonable certainty. See Great Pine Water Co. v. Liqui-Box Corp., 203 F.3d 920, 922 (5th Cir. 2000)(citing Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractor's, Inc. [hereinafter, Formosa], 960 S.W.2d 41, 50 (Tex. 1998)); SBC Operations, Inc. v. Bus. Equation, Inc., 75 S.W.3d 462, 466 (Tex. App.—San Antonio 2001, pet. denied)(citing Szczepanik v. 1st S. Trust Co., 883 S.W.2d 648, 649 (Tex. 1994)). Years ago, the

Supreme Court of Texas summarized the decisions of Texas courts on

lost profits:

> In order that a recovery may be had on account of loss of
> profits, the amount of the loss must be shown by
> competent evidence with reasonable certainty.  Where the
> business is shown to have been already established and
> making a profit at the time when the contract was
> breached or the tort committed, such pre-existing profit,
> together with other facts and circumstances, may indicate
> with reasonable certainty the amount of profits lost.  It
> is permissible to show the amount of business done by the
> plaintiff in a corresponding period of time not too
> remote, and the business during the time for which
> recovery is sought.  Furthermore, in calculating the
> plaintiff's loss, it is proper to consider the normal
> increase in business which might have been expected in
> the light of past development and existing conditions.

Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc., 877 S.W.2d

276, 279 (Tex. 1994).

The standard "is intended to be flexible enough to accommodate

the myriad circumstances in which claims for lost profits arise."

VingCard A.S. v. Merrimac Hospitality Sys., Inc., 59 S.W.3d 847,

863 (Tex. App.—Fort Worth 2001, pet. denied)(citing Tex.

Instruments, Inc., 877 S.W.2d at 279).  Recovery of lost profits

should be denied where the evidence demonstrates "that such profits

claimed are too uncertain or speculative[] or where the enterprise

is new or unestablished[.]"  Tex. Instruments, Inc., 877 S.W.2d at

279.

Whether lost profits are established with reasonable certainty

is the type of factual issue that falls "within the exclusive

province of the jury."  Id.; see also DaimlerChrysler Motors Co.,

LLC v. Manuel, 362 S.W.3d 160, 191 (Tex. App.—Fort Worth 2012, no pet.)(quoting Holt Atherton Indus., Inc. v. Heine, 835 S.W.2d 80, 85 (Tex. 1992))("What constitutes reasonably certain evidence of lost profits is a 'fact intensive determination.'"); Tex. Instruments, Inc., 877 S.W.2d at 279 (quoting Whiteside v. Trentman, 170 S.W.2d 195, 197 (Tex. 1943)("Profits are not always speculative and remote. Whether in a given case they should be so classified depends altogether upon the facts and circumstances of that particular case."). The lost profits calculation "must, at a minimum, be based on objective facts, figures, or data from which the amount of lost profits can be ascertained." Formosa Plastics Corp. USA, 960 S.W.2d at 50 (citing Holt Atherton, 835 S.W.2d at 84).

In Formosa, 960 S.W.2d at 49-50, the Texas Supreme Court found that expected lost profits incorporated into an out-of-pocket damages calculation were not supported by the evidence, which reflected that a bargain was never made. The court explained, "[T]he out-of-pocket measure only compensates for actual injuries a party sustains through parting with something, no loss of profits on a bid not made, and a profit never realized, in a hypothetical bargain never struck." Id. In discussing lost profits incorporated in a benefit-of-the-bargain damages calculation, the court found the doubling of the accepted bid was speculative because it was not supported by any evidence that the project would

have been accepted if the bidder had submitted a higher bid. Id. at 50. "In fact, if any inference could be drawn, it would lead to the opposite conclusion because two of the three other bids . . . received were lower than [the proposed higher bid]." Id. The court determined that pursuant to either an out-of-pocket or a benefit-of-the bargain calculation, damages were supported by the evidence, based on the actual bid, not a higher, hypothetical bid. Id. at 51.

Alvarez testified that, based on Urelift's exclusive contract with Uretek, it obtained a government no-bid contract in December 2009 based as the "sole source" of the Uretek process.[96] That contract entitled it to receive 735.34 pesos per kilogram of polyurethane stabilizer sold by Uretek and, because Urelift was deemed the sole source, the contract was issued directly, without competitive bidding by other vendors.[97] Plaintiffs' expert, Blacker, predicated the calculation of lost profits based on that historical figure.

## 1. CAPUFE, SIOP #1, SIOP #2, and GFB

Blacker determined that Uretek sustained $6,110,000 in lost profits on CAPUFE, SIOP #1, SIOP #2, and GFB. Because each project showed an incremental polymer price lower than that paid in December 2009, Urelift sought damages based on the difference

---

[96]     See Tr1. 69-70; Doc. 121-1, Annex 8 to Def.'s Mot. for J. as a Matter of Law, Pl.'s Trial Ex. 140, Summary of Projects.

[97]     See Tr1. 72.

between the no-bid contract price of 735.34 pesos per kilogram of polymer and the price negotiated between Urelift and the government department.

The jury heard Alvarez testify that in order to win the four contracts with these government departments, Urelift was forced to reduce its price from the 2009 price.[98] Alvarez repeatedly attempted to inject hearsay testimony to the effect that he was told to reduce the price of the polymer because of competition; each time the court sustained the hearsay objection.[99] The CAPUFE project was awarded in October 2013, the SIOP#1 was awarded in December 2013, the SIOP#2 was awarded in August 2014 and the GFB was awarded in May 2015.[100]

The dates are significant because the trial record showed that ALSO came into the marketplace as a bidder on projects in September 2015 and not before. Although the evidence that Uretek breached its contract by competing with Urelift through SPI is more than sufficient to uphold a general liability finding, evidence that Urelift was damaged by competition assisted by Uretek or SPI on these four projects is wholly lacking.

Blacker's testimony on these contracts never referenced the evidence on which he relied to find that competition backed by

---

[98]  See Tr1. 96-97.

[99]  See Tr1. 96, 98, 99.

[100]  See Doc. 126-1, App'x, Pls.' Trial Ex. 140 p. 35.

Uretek existed at the time bids were solicited on these four projects. Alvarez himself was not able to identify any competitor to these four projects, much less connect that competitor to Uretek. In fact, Alvarez conceded that the competition on these four contracts was "unknown," and that Urelift did not lose any bid because of that competition.[101]

Urelift argues that, by virtue of the 2003 Sublicense Agreement and its obtaining a sole-source contract designation in 2009 from one government agency, all other government agencies were required to award Urelift contracts through sole-source bids at the 735.34 pesos price even if they deemed the bid process to be competitive and even where the contracts did not expressly require the use of a licensed Uretek product or process. The only evidence supporting this argument is Alvarez's opinion. As Alvarez was not tendered as an expert in Mexican law, his opinion that receiving a sole-source designation in 2009 translated into a future of non-competitive contract awards is unsupported and cannot form the basis of an award of lost profits in the present case.

The court finds no legally sufficient evidentiary basis for a reasonable jury to have awarded lost-profit damages for those four projects. That portion of the jury verdict must be vacated.

## 2. Chapultepec

---

[101] As outlined above, when asked who was the competition, Alvarez stated, "Unknown companies. Very small companies that had nothing to do with stabilization of soils and they lost." See Doc. 114, Tr1 p. 143.

Blacker determined that Urelift sustained $2,650,000 in lost profits on the Chapultepec project, a project on which Urelift was not permitted to bid by the contracting party. The difference between this project and CAPUFE, SIOP #1, SIOP #2, and GFB is that the evidence established that ALSO was awarded this contract, albeit by direct award as a sole source and not by a competitive bid.

Alvarez testified that Urelift would have submitted a bid on this project had it been allowed to do so.[102] The court did not permit Alvarez to speculate that Urelift would have obtained the Chapultepec contract if it had been permitted to bid on it.[103] Urelift offered no testimony from the Chapultepec principals concerning the basis on which the contract was awarded to ALSO or, absent the presence of ALSO in the marketplace, that Urelift would have been awarded the Chapultepec contract.

Because the Chapultepec lost profit damages were based on the jury's speculation that Urelift would have been awarded the contract, but for the wrongful conduct of Uretek, it falls afoul of Formosa. See Formosa, 960 S.W.2d at 50 (holding that the bid was speculative because there was no evidence that Presidio would have been awarded the project if it had made a $1.3 million dollar bid).

The court finds no legally sufficient evidentiary basis for a

---

[102]    See Doc. 114, Tr1. p. 118.

[103]    See id. p. 119.

reasonable jury to have awarded lost-profit damages for the Chapultepec project.

### 3. **Metro Linea A**

Blacker determined that Uretek sustained $4,310,000 in lost profits on Metro Linea A. The difference between this project and all prior projects is that the evidence established that Uretek, through ALSO's bid, did compete with Urelift in violation of the 2003 Sublicense Agreement. Mexico City awarded ALSO the contract. Other than Uretek's challenge to Blacker's calculation of the lost profits sustained by Urelift, which the court has determined met reliability standards, Uretek disputes the jury conclusion that Urelift would have won the bid had ALSO not competed with it.

The facts here are not as cut and dried as those in Formosa. There, the parties entered into a contract, but testimony was offered that the bidder would have submitted a much higher bid had it known about the misrepresentations made by the other party. See Formosa, 960 S.W.2d at 49. The Texas Supreme Court found the evidence was too speculative to support damages based on a bid that was never presented or accepted. Id. at 49-50. The Formosa court was focused on the correct amount of the lost profits to be awarded and found that the plaintiff was entitled to lost profits based on its bid, but not lost profits based on a hypothetical bid that was never considered.

In Lovelace v. Sabine Consol., Inc., 733 S.W.2d 648 (Tex. App.

1987 [14th Dist.] 1987), the court found that a jury verdict for lost profits was not supported by evidence of reasonable certainty where Sabine Consolidated, Inc. ("Sabine") was not able to show that its bid would have been accepted. Id. at 651. The only testimony supporting the lost profits award was the testimony of Sabine's principal, who testified that he prepared a bid on the project but was disqualified from bidding because Sabine's bonding company would not issue a bond for the amount required.[104] Id. at 655. He averred that because the winning bid was higher than the bid he prepared for Sabine, Sabine would have been the low bidder, and that Sabine would have made between $400,000 and $500,000 in net profit. Id. The jury agreed, and awarded lost profit damages. Id.

The court of appeals reversed, finding that there was no evidence that the bid would have been within specifications, that Sabine would have been found to be the lowest responsible bidder or that the project would have been profitable. Id. at 656. The court stated, "In summary, there is a complete absence from the record of objective facts, figures, and data without which it cannot be ascertained with the required degree of certainty that the [] job would have been awarded to Sabine and would have been profitable." Id.

Here, the evidence of Uretek's liability based on wrongful

---

[104] Presumably, this was attributable to Lovelace's wrongful conduct because it was not an issue on appeal.

competition was sufficient to support the jury's liability finding for breaching the non-compete provisions of the 2003 Sublicense Agreement. Although ALSO was not an active bidder on the project until 2015, ample evidence showed that Uretek encouraged ALSO to compete on the Metro Linea A project prior to that date.

Per his testimony, Barron was in contact with Sosa as early as May 2014 concerning a Metro project. In an email exchange dated August 14, 2014, Barron and Sosa discussed government projects including Metro Linea A.[105] More than once in the email to Barron, Sosa referenced "our friend" as someone who had provided prior information to ALSO on what would occur with the projects and as someone who would contact the mayor "to push things with the argument that one of his Congress man [sic] said that Line A [would] have to be closed sooner than expected, that they need[ed] to push the project to []stabilize the Line."[106] Sosa followed that statement with, "I hope you get the big idea which I am trying to communicate wh[i]ch are [sic] great[] news."[107] In response, Barron stated, "All of our friends have shown confidence in the technical and financial proposals."[108] Barron also encouraged Sosa to "ask

---

[105] See Doc. 121-1, Annex 5 to Def.'s Mot. for J. as a Matter of Law, Emails Dated Aug. 14, 2014, Between Barron & Sosa.

[106] Doc. 121-1, Annex 5 to Def.'s Mot. for J. as a Matter of Law, Email Dated Aug. 14, 2014, From Sosa to Barron.

[107] Id.

[108] Doc. 121-1, Annex 5 to Def.'s Mot. for J. as a Matter of Law, Email Dated Aug. 14, 2014, From Barron to Sosa.

for help from the various sources" to speed up the process.[109]

On July 20, 2016, eight days prior to the meeting of those persons responsible for awarding the bid on Metro Linea A, Barron sent a letter to Mexico City authorities accusing Urelift of doing poor work and of falsely claiming to use products that it did not use. In an email dated August 1, 2016, Sosa notified Barron that ALSO had won the bid for Metro Linea A and thanked Barron for all of his support "in this phase of ALSO," stating that ALSO would not be in that position without his help.[110]

The jury was entitled to make credibility judgments and to draw inferences from this evidence that Uretek did more than innocently provide polymer to SPI and intended to breach the 2003 Sublicense Agreement by using SPI to supply ALSO with polymer. The court's required deference to the jury's verdict is too great to ignore this evidence, which provides a sufficient basis for the inference that Uretek had some influence in the bid process by offering its opinion about the quality of Urelift's work and the products it employed. However, the court cannot take the next step and conclude that the jury heard any evidence that, had Uretek not breached the 2003 Sublicense Agreement, Mexico City would have,

---

[109]   See id.

[110]   See Doc. 124-1, Annex 7 to Pl.'s Resp. to Def.'s Mot. for J. as a Matter of Law, Pl.'s Trial Ex. 24, Email Dated Aug. 1, 2016, from Sosa to Barron.

with reasonable certainty, awarded the bid to Urelift.[111]

The evidence at trial established that ALSO's bid was accepted and that Urelift and Comsa Emte were both disqualified. Urelift was disqualified for fourteen enumerated reasons, reasons that had nothing to do with Uretek's breach of the 2003 Sublicense Agreement.[112] Mexico City generally explained to Urelift that its bid was rejected because the bid: (1) lacked evidence that Urelift had adequate working capital; (2) failed to adequately document the monthly amounts of labor, machinery, service personnel, and materials to be expended; (3) failed to analyze the costs of the operation; and (4) lacked a detailed analysis of unit pricing.[113] Urelift failed to factually rebut those fourteen reasons and offered no evidence about the grounds on which Comsa Emte was disqualified. Urelift's unsuccessful bid was higher than Comsa Emte's bid, making Comsa Emte's bid at least facially more appealing financially.

Urelift offered no testimony from a representative of Mexico City that would support an inference that Urelift would have been awarded the project if ALSO had not wrongfully competed through Uretek and SPI. All the jury had before it was Alvarez's opinion

---

[111] The court notes that by virtue of its issuing a competitive bid package, Mexico City apparently did not deem this contract for soil stabilization to be "sole source."

[112] See Doc. 121-1, Annex 11 to Def.'s Mot. for J. as a Matter of Law, Letter from Mexico City to Urelift Dated July 27, 2016.

[113] See id. pp. 65-68.

that Urelift would have been awarded the project despite the enumerated shortcomings of Urelift's bid and despite the fact that it was the highest bid submitted. While obtaining evidence from Mexico City on that point might have been difficult to obtain, it does not excuse Urelift from its burden to prove it would have been awarded the contract with reasonable certainty.

"While some uncertainty as to the amount of damages is permissible, uncertainty as to the fact of damages defeats recovery." Blase Indus. Corp., 442 F.3d at 238. "When the evidence offered to prove a vital fact is so weak as to do no more than to create a mere surmise or suspicion of its existence, the evidence is, in legal effect, no evidence." Lovelace, 733 S.W.2d at 656 citing Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059, 1063 (1898); Southwestern Bell Tel. Co. v. McKinney, 699 S.W.2d 629, 632 (Tex. App. - Dallas 1985, writ ref'd n.r.e). Alvarez's opinion is nothing more than speculation. The court finds that there is no evidence to support the award of lost profits to Urelift on the Metro Linea A project.

The court will enter a Final Judgment to UdeM in the amount of $1,460,000 by separate order.[114]

---

[114] The liquidated damages award to UdeM includes damages for Uretek's breach of contract regarding the Metro Linea A project and the Chapultepec project. While this may be of no comfort to Urelift, Urelift and UdeM allocated liquidated damages in this manner.

**SIGNED** in Houston, Texas, this 17th day of January, 2020.

Nancy K. Johnson
United States Magistrate Judge